IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

TAMAR DEVELL HARVEY,   )
   Plaintiff,     )   Civil Action No. 7:18-cv-00097
          )
v.         )
          )   By: Elizabeth K. Dillon
D. LANDAUER, *et al.*,   )    United States District Judge
   Defendants.    )

**MEMORANDUM OPINION**

*Pro se* plaintiff Tamar Devell Harvey brought this civil rights action asserting claims pursuant to 42 U.S.C. § 1983 against a number of defendants.[1]  All of his claims are based on alleged events occurring during Harvey's incarceration at Augusta Correctional Center ("ACC"). Addressed in this opinion are three separate motions filed by three defendants, all seeking summary judgment as to Harvey's Eighth Amendment claims against them.  The three, all of whom were employed by Mediko, PC at the relevant time, worked in the medical department at ACC: Dr. Diane Landauer, a board certified physician in the specialty of family medicine, Nurse Ella Shipp, a registered nurse and ACC's Director of Nursing,[2] and Nurse Terry Hamilton, a registered nurse. Because the factual background of the claims against them substantially overlaps, the court addresses the three motions in a combined opinion and order.

For the reasons set forth herein, the court will grant all three motions for summary judgment.

---

[1]  Harvey initially asserted claims against more than two dozen defendants.  As to those defendants that remain in the case, the operative complaint against the defendants represented by the Office of the Attorney General, or "the VDOC defendants," is docketed as an Amended Complaint at Dkt. No. 196.  The complaint governing the claims against the remaining parties, including these three Mediko defendants—is the original complaint, Dkt. No. 1, as amended by Dkt. No. 19.  (Dkt. No. 195 at 7.)

[2]  Shipp has retired since the relevant events.  (Shipp Aff. ¶ 2, Dkt. No. 181-1.)

# I.   BACKGROUND

## A.  Harvey's Claims

### 1.   Claims Against Hamilton

On July 21, 2017, Harvey was injured during an altercation with another inmate at ACC. His claims against Hamilton are based solely on Hamilton's medical treatment of him following that altercation.  Specifically, Harvey's complaint references Hamilton's actions or omissions in only one paragraph, which reads:

> Male Nurse T. Hamilton was deliberately indifferent to Harvey's serious medical needs, by refusing to administer pain medication.  He also lied to Harvey stating that U.V.A. purportedly "denied" his appointment, when I would hope that, **No** hospital would ever do so. T Hamilton's responses to his grievances for additional pain medication also evinces deliberate indifference as Harvey's pain medication was significantly decreased upon his return to the "ACC" compound.  Moreover, he also refused to pass on Harvey's request.

(Compl. ¶ 8, Dkt. No. 1.)

Based on this, it appears that Harvey is basing his Eighth Amendment claim on the following alleged actions by Hamilton in the July and August 2017 time-frame: (1) refusing to administer pain medication; (2) lying to Harvey about the University of Virginia ("UVA") denying Harvey an appointment; (3) refusing to provide additional pain medication in response to Harvey's grievances; and (4) refusing to pass on Harvey's request for additional pain medication.

### 2.  Claims Against Dr. Landauer

With regard to Dr. Landauer, Harvey alleges that, after the July 21 incident, she refused to prescribe him pain medications and refused to issue bottom bunk status to him.  (Compl. ¶ 3.)  He also alleges that she refused to send him to UVA hospital or any other outside medical providers to address his injuries and that she engaged in a cover-up regarding these actions.  (Compl. ¶ 5.) Harvey further alleges that, after he was physically and sexually assaulted by his cellmate on

2

October 24, 2017, Dr. Landauer refused to treat him or to send him to an outside medical provider. (Compl. ¶ 19.)[3]

### 3. Claims Against Shipp

Harvey's claims against Shipp appear to arise primarily from her responses to his grievances. Specifically, he asserts that she was deliberately indifferent to his serious medical needs because she allegedly lied in telling him that "medical submitted paperwork to get him seen by ENT [an abbreviation for the medical specialty of otolaryngology, commonly known as ear, nose, and throat] on July 24, 2017." (Compl. ¶ 6.) He also claims that she lied when she stated that he received pain medications. (*Id.*)

## B. Factual Background

The court turns next to the more specific details about the factual background of his claims. For this background, the court relies on the following documents in the record: (1) the affidavits of Hamilton, Shipp, and Landauer; (2) Harvey's medical records (Dkt. No. 171-1, "Med. Rec."), his medicine administration record showing what medicines were given to him and when (Dkt. No. 171-2, "MAR"), and documents related to his administrative grievances (Dkt. No. 171-3, "Grievances"),[4] all of which are attached to defendants' motions; and (3) Harvey's verified

---

[3] In addition to these claims, Harvey makes two other allegations against Dr. Landauer. The court addresses them only briefly because it is clear that neither states a viable Eighth Amendment claim. First, Harvey alleges that Dr. Landauer "laughed in his face." Even if true, allegations of rudeness, or even "threats or verbal abuse by prison officials, without more, do not state a cognizable claim under § 1983." *Henslee v. Lewis*, 153 F. App'x 178, 180 (4th Cir. 2005). Nor does a single incident of laughing (which allegedly occurred in connection with her denial of his bottom bunk request) support a deliberate indifference claim. *Cf. Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987) (finding deliberate indifference where a doctor "ridiculed" a transsexual prisoner and told her that "he would make sure she never received estrogen treatment as long as she was incarcerated").

Second, he alleges that Dr. Landauer refused to treat his acne. (Compl. ¶ 20.) First of all, the medical records show that he received a prescription sufficient to treat acne at around the same time he complains of a lack of treatment. (*See* Landauer Aff. ¶¶ 24–27.) Regardless, Harvey's acne was not a serious enough medical condition to give rise to an Eighth Amendment claim. *See Ferrell v. Heatwole*, No. 7:07cv00451, 2007 WL 2973461, at *1 (W.D. Va. Oct. 9, 2007) (holding that severe facial and back acne was not a sufficiently serious medical condition to support an Eighth Amendment claim and collecting authority holding that acne does not constitute a serious medical condition).

[4] The 108 pages of documents labeled as "Grievances" consist of the documents Harvey initially submitted with his complaint, Dkt. No. 1-1. He later submitted additional grievance-related documents as exhibits to his own first summary judgment motion. (*See* Dkt. No. 6-1.)

responses in opposition to the motions (Dkt. Nos. 187, 189, 190) and the documents attached thereto.  As it must, the court construes all facts in the light most favorable to Harvey.

### 1. The Assault and Treatment at Augusta Medical Emergency Department

Harvey alleges that on July 21 he was assaulted by offender Poe, who used a pad-lock and razor blades during the attack.  Afterward, Harvey was evaluated briefly at the scene and then transported to the medical unit at ACC.  He was then transported to the Augusta Medical emergency department ("the ER").  While at the ER, he received stitches on his forehead and around his right eye.  The ER physician, Dr. Rylak, ordered a CT scan, which was performed.  In addition to referring to the body of his report, the radiologist listed four impressions: "1. Communicated minimally depressed fracture of the inferior aspect of the anterior wall of the right maxillary sinus. 2. Preorbital soft tissue swelling.  No intraorbital abnormality. 3. Fractures of the nasal bones and possible fracture of the nasal septum; 4. Fluid in the right sphenoid sinus, concerning for fracture of its wall."  (Med. Rec. 26.)

Harvey alleges in grievances attached to his verified complaint that Dr. Rylak told Harvey that he would need "multiple operations" to fix his injuries.  (*See* Compl. 1-1, at 6.)  Harvey also alleges that Dr. Rylak improperly released Harvey back to VDOC custody, rather than admitting him to the hospital, which Harvey states was deliberately indifferent given the results of his CT scan.  (Compl. ¶ 11.)

### 2. Prescription and Administration of Pain Medication

When Harvey returned that same date to ACC's medical unit, the physician on staff was Dr. Arakaky,[5] who prescribed both a painkiller and a penicillin antibiotic for Harvey.  Notably, Harvey

---

[5] According to Dr. Landauer, Dr. Arakaky was not a Mediko employee but was instead a "*locum tenens* physician [meaning one who temporarily filled the place of another] who provided care and treatment to prisoner-patients" at ACC during Dr. Landauer's leave of absence, which was from February 2017 until July 31, 2017.  (Landauer Aff. ¶¶ 6, 17 & n.2.)  Dr. Arakaky was named as a defendant, but Harvey has not yet served him.

was then kept in the infirmary and under observation for 17 days: from July 21 through August 7. (Landauer Aff. ¶ 10.)  During that time, he was observed and medicine was regularly administered to him, although there were two days in which there was a gap in his medication, and Harvey complained several times (both before and after that gap) that the medicine he was receiving was not sufficient for his pain.  His Norco prescription was discontinued after August 4, but he continued to receive ibuprofen through August 17, nearly a full month after the assault.

Shipp's affidavit contains a detailed explanation, pieced together from the medical records and MAR, as to when Harvey was prescribed what medicines for pain and when he received them. Pursuant to the initial prescription from Dr. Arakaky, Harvey received Norco (which contains 5mg of hydrocodone, a narcotic painkiller, and 325 mg of acetaminophen, a non-narcotic painkiller), three times a day from the time he returned from the ER on July 21 through July 30.  On July 31 and August 1, he did not receive his painkillers.

According to Shipp, there is some confusion as to whether Harvey was entitled to Norco on July 31 and August 1 because of a discrepancy between Dr. Arakaky's handwritten note (which contained a specific number of tablets) and Harvey's electronic MAR, which reflected a date-range for the prescription.  If the handwritten order was right, Harvey still had three pills left for July 31, and two on August 1.  If the electronic MAR was correct, then his Norco order expired on July 30. Neither Shipp nor anyone else has provided any additional explanation as to why he did not receive medication on July 31.  Assuming that he was still supposed to be getting Norco on August 1, the pharmacy was out of Norco that day, and so he received none.  (MAR 2, 3, 7; Shipp Aff. ¶¶ 17–19.)[6]

Also, on August 1, Dr. Landauer examined Harvey and renewed the prescription for Norco,

---

[6] The parties do not provide any information about what generally occurs when the pharmacy is out of a prescribed medicine or what the policy is in that circumstance.

ordering that the medication be given three times per day for three days. She also prescribed ibuprofen for him for three times per day from August 2–6. Because that appointment occurred after the pill window had closed, Harvey began receiving both medications at 6:00 a.m. the following morning, August 2. Beginning August 7, Dr. Landauer reduced his prescription, and he received his last dose the morning of August 17.

During the period of July 24 through August 17, Harvey submitted a number of written requests for additional or different medical treatment, many of which were submitted while he was still housed in the infirmary. First, he filed at least two emergency requests, each of which Hamilton rejected as not constituting an emergency. Hamilton instead directed Harvey to submit a sick call slip. (Dkt. No. 6-1, at 9, 23.) He also filed four informal complaints to which defendant Shipp responded. (Grievances 6, 11, 17, 22; Shipp Aff. ¶¶ 11, 13, 23, 25.) Two of these related to his desire for a follow-up appointment and are discussed in context in Section I.B.3., *infra*. The other two, summarized here, related to his pain medication:

- On July 26, Harvey submitted an informal complaint describing his injuries, stating that he was experiencing excessive pain daily, setting forth the medicine that he was given in the ER, and stating that the pain medication given to him at ACC "has no effect whatsoever." On August 3, Shipp responded that he was "receiving a narcotic pain medication and ibuprofen (an anti-inflammatory medication). She noted that the narcotic had been "scheduled every 8 hrs since your return from the hospital" and that "ibuprofen was added Aug 1, 2017." (Grievances 22; Shipp Aff. ¶ 23.)

- On August 2, Harvey filed a complaint stating that he had expressed during his August 1 visit with Dr. Landauer that he had a very high level of pain and she had said she would put him back on some type of pain medication, but he never received any pain medication at that time or during the day of August 1. On August 7, Shipp responded that Dr. Landauer had ordered "Norco three times per day x3 days which you received" and "ibuprofen 400 mg 3x day [for] five days that you received." She added that "today" Dr. Landauer "ordered ibuprofen 300 mg two times daily at the pill window since your release from the medical observation ward" August 7. (Grievances 11; Shipp ¶ 25.)

Additionally, on at least one occasion *after* his August 14 outside appointment, in a grievance he dated September 14, 2017, Harvey complained that he had not received his anti-

inflammatory medication, Naprosyn (or the generic naproxen) for the five days of September 11 to September 15.  (Grievances 66.)  Shipp responded that, on August 25, Dr. Landauer had "ordered naprosyn to run through 9/24/17" and added that "on the days you came to pill line you received the medication."  (*Id.*)

Harvey correctly notes that the MAR appears to show that, at the 4:00 p.m. dispensing time on September 11, 12, and 13, he did not receive his Naprosyn and the record states that the "medication has not arrived."  (Dkt. No. 190 at 6; MAR 8, 10.)  But his grievance seems to allege that he did not receive that medication at the morning pill window, either, and that he did not receive it on September 14 or 15, despite the undisputed medical records showing he did.[7]  He points to both Shipp's response and the MAR as further evidence of lying,[8] as well as showing deliberate indifference by defendants to his pain.  But even if he did not receive medication on those dates, there is no indication that any of the named defendants subjectively knew that he was not

---

[7]  Relatedly, Harvey repeatedly alleges that his medical records, submitted with defendants' summary judgment motions, are not a true and correct copy.  He also claims that they have "illegally been tampered with and altered by counsel."  For support, he attaches Exhibits A, B, and C, which indicate that when he was transferred to a different VDOC facility in February 2018, one of Harvey's charts was missing.  (*See* Dkt. No. 187-1, at 1–3.)  Underneath that notation on Exhibit C is the comment "last HIV-1 RNA Quant 9/25/17," although it is unclear if that notation relates to the missing chart or not.  The fact that one of his charts was missing, however, does not mean that the medical records submitted are false; it means only that one chart is missing and thus the records may not be complete.  Harvey makes conclusory allegations of tampering, but he does not identify what he believes was contained within the missing chart, the dates to which it purportedly relates, or how any of the supposedly missing information would change the outcome in this case.  The documents he provides as supporting evidence, moreover, do not show what he contends.  For example, he cites to his Counter Exhibits A and B, but those are simply a subpoena duces tecum for his medical records and letter to Mr. Harvey from counsel enclosing a copy of that subpoena.  (Dkt. No. 187-1, at 4, 5.)  He also refers to different notations on various other documents, (*see, e.g.*, Dkt. No. 187 at 17–20), but despite his theories, none of these reflect any evidence of tampering at all, let alone with regard to any material matter that could affect the court's resolution of these motions.

[8]  Harvey repeatedly accuses the Mediko defendants and their counsel of lying in their affidavits.  (*See, e.g.*, Dkt. No. 190 at 3–4.)  And the court agrees that some grievance responses were not entirely accurate and that there are inconsistencies between some of the affidavits.  For example, Dr. Landauer and Hamilton both aver that Harvey's medical record indicates that he was given all of the medication that was indicated for his condition, but Shipp's affidavit, which included a careful review of the MAR, shows that Harvey did not receive his July 31 or August 1 pain medication, as set forth in Dr. Arakaky's handwritten order.  Although there may well be valid reasons for the discrepancies in their statements, it matters not for purposes of a summary judgment motion.  The court does not judge credibility at this stage, but simply must construe all facts in the light most favorable to Harvey.  Thus, to the extent that there are conflicts in the testimony of different witnesses, the court simply adopts the version of events that is most beneficial to Harvey.  With regard to the medication, for example, the court credits Shipp's testimony that Harvey received no pain medication on July 31 and August 1.

receiving that medication or that they believed that his not receiving several days of a thirty-day course of anti-inflammatory medicine put him at risk of any serious harm.

### 3.  Referral to Outside Provider

After Harvey returned to ACC following his ER visit, Harvey alleges that personnel in the ACC medical department failed to timely ensure that he receive his necessary surgeries by delaying his treatment by an outside provider.  By the time he was seen by an outside specialist—on August 14, 2017—that physician, Dr. Park of UVA, opined that surgery was not appropriate due, at least in part, to the passage of time.  Specifically, the notes from that appointment state:

> On examination, we noted his septum is deviated to the right and his nasal bones are straight but slightly flattened.  Nasal bones are not mobile.  We informed him that because his fractures were sustained 2.5 weeks ago the frontal and nasal bones have already set and cannot be reduced without breaking them again.[9]  We recommended no medical intervention or surgery at this time.  We instructed him to avoid nasal trauma for another 3 weeks and that if his right sided nasal obstruction becomes more severe to follow up with the prison physician.  The patient was in understanding and in agreement with this plan.

(Med. Rec. 20.)  Dr. Park also completed a form stating that his findings upon examination showed "well-healed lacerations, healing nasal bone, and anterior table frontal sinus fractures" and, in the field of "treatment and medications recommended," he wrote, "No intervention necessary."  (Med. Rec. 18.)  In "Follow-up appointment date and time," Dr. Park wrote, "Not needed."  (*Id.*)

Nonetheless, Harvey alleges that he continued to experience significant pain for months, and that eventually, before he filed his complaint, his right nasal passage was "completely inactive" and his nose "still deformed."  (Compl. ¶¶ 9, 13.)  He contends that defendants' delay in obtaining adequate outside treatment prolonged his pain and suffering and "imposed a life-long handicap and a significant permanent loss regarding [his] nose."  (Dkt. No. 187 at 10.)

---

9  The assault actually happened closer to 3.5 weeks before the August 14, 2020 appointment, not 2.5 weeks.

For purposes of summary judgment, the court will credit Harvey's statement in his verified complaint that the ER physician, Dr. Rylak, told Harvey that he would need surgeries immediately. But critically, none of the medical *documentation* completed by Dr. Rylak and provided to ACC medical staff contains that information, nor is there evidence that Dr. Rylak conveyed that information to any medical personnel at ACC.  Indeed, Dr. Rylak's discharge instructions do not state that surgery was required immediately or even that surgery would be needed in the future. Instead, they directed Harvey/ACC to call Monday, July 24, 2017, to obtain appointments with UVA neurosurgery and an ENT physician.  Thus, the medical records do not show that Dr. Rylak believed Harvey needed immediate surgeries nor—more importantly—did anything in the medical record inform the ACC providers that Harvey needed surgeries, immediate or otherwise.

Moreover, the undisputed medical documentation reflects prompt action by ACC staff to follow Dr. Rylak's directions to obtain an outside appointment for Harvey.  First of all, on Monday, July 24, the very next business day after Harvey's injuries and the date Dr. Rylak directed Harvey/ACC to call for an appointment, Shipp sought—at Dr. Arakaky's request—an  appointment with UVA neurosurgery by completing a Utilization Management Consultation Request ("UMCR") form, which was submitted the same date to the UM reviewer, Dr. Abraham Teklu.  (Med. Rec. 17.)[10]  The form requested a "next available" appointment.  (Med. Rec. 17, 27; Shipp Aff. ¶ 7.)  As a choice between "routine" and "urgent," either Dr. Arakaky or Shipp marked the request as "urgent," which the form states means "needs to happen within 48-72 hrs."  Dr. Teklu sent the request back seeking additional information as to why the request was for neurosurgery as opposed to an ENT, "for what was essentially a broken nose."  (Med. Rec. 17; Shipp Aff. ¶ 8.)  It is unclear what steps, if any, were taken from July 24 until July 31 to communicate with Dr. Teklu, to obtain

---

[10]  The UMCR is a Mediko form used by medical staff at VDOC facilities to request outside medical treatment for a patient-prisoner.

UM approval, or to schedule that appointment.  But it is undisputed that the first record of the appointment having been made appears in Harvey's record on July 31.

On that date, Catherine Kishpaugh noted in Harvey's medical record that the UVA neurosurgery department had refused to see Mr. Harvey, as had the Augusta Health Center ENT department.  (Med. Rec. 66; Shipp Aff. ¶ 9.)  At the recommendation of UVA's neurosurgery department, an appointment was made for Harvey with the ENT department of UVA ("UVA ENT") and was scheduled for August 14, according to the medical records.  (Med. Rec. 66; Shipp Aff. ¶¶ 9, 10.)  These facts were also noted on the July 24 UMCR form.  (Med. Rec. 17.)

When Dr. Landauer returned from her leave of absence on August 1, she reviewed Harvey's chart and added a note to "check on UM [utilization management] for ENT at UVA."  (Med. Rec. 65; Landauer Aff. ¶ 16.)  This order "directed the nursing staff to check to make sure that Mr. Harvey had an appointment for treatment at the ENT department at UVA hospital to follow-up on his injuries."  (Landauer Aff. ¶ 16.)  She explains that she was notified, on August 3, that Harvey had an August 14 appointment with UVA ENT, pursuant to the July 24 UMCR.  Apparently because that UMCR had only requested a neurosurgery appointment and because the neurosurgery department would not take the consultation, Dr. Landauer "executed another [UMCR] to formalize the previously-scheduled August 14, 2017 appointment with UVA ENT."  (Landauer Aff. ¶ 17.)

As noted, prior to his August 14 appointment with Dr. Park, Harvey filed two informal complaints concerning his request for outside medical treatment.  Specifically:

- On July 26, Harvey submitted an informal complaint requesting a follow-up appointment for his injuries  On August 3, Shipp responded that his appointment with UVa had been scheduled. (Grievances 6; Shipp Aff. ¶ 11.)

- On July 31, Harvey submitted an informal complaint complaining that it was ten days past assault and that he needed to promptly have two very costly surgeries to repair the damage to his face and that Dr. Arakaky was informed of his serious injuries and had failed to promptly order those surgeries. Harvey also complained that Dr. Arakaky's departure from ACC before

sufficiently treating Harvey's serious medical needs was "very unethical."  On August 7, Shipp responded by essentially setting forth the dates and types of treatment that Harvey had received from Dr. Arakaky and from Dr. Landauer, and also noted that he had a scheduled appointment with an ENT. (Grievances 17; Shipp ¶ 13).

After the August 14 appointment occurred, Dr. Landauer reviewed Dr. Park's report.  Based on her review of Dr. Park's recommendation and based on Dr. Landauer's "education, training, and experience," she believed that additional outside consultations for Mr. Harvey's July 21 injuries were unnecessary.  (Landauer Aff. ¶ 19.)  Harvey argues that the initial delay in treatment, and possibly the continued determination that he did not require additional outside treatment, resulted in not only significant pain while he awaited the appointment, but also caused him to suffer permanent deformity of his nose and to experience a loss of an ability to breathe out of the right side of his nose.

### 4.  Harvey's Bottom Bunk Request

As noted, Harvey also claims that Dr. Landauer was deliberately indifferent to his medical needs for failing to issue him a lower bunk pass.  On August 12, Harvey submitted a grievance concerning Dr. Landauer's alleged refusal to write a medical order for a bottom bunk for him. (Grievances 41); on August 21, Shipp responded that he currently had a bottom bunk.

Dr. Landauer's affidavit explains that Harvey was housed in the medical infirmary until August 7, where there are no top bunks.  Thus, no bottom bunk order was required through August 7.  Harvey states that he requested a lower bunk order when he left to return to general population.[11] Dr. Landauer avers, though, that her physical exam of Harvey on August 7 "revealed no objective symptoms (such as dizziness or lower-extremity limitations/pain) indicating a bottom-bunk pass was indicated."  (Landauer Aff. ¶ 13.)  She also notes that, on August 13, Harvey was placed in segregation, which likewise does not have top bunks.  She then summarizes that "[d]uring the time I

---

[11]  Dr. Landauer denies this, but the court construes the disputed facts in Harvey's favor.

treated Mr. Harvey for his July 21, [2017] injuries, bottom bunk status was neither indicated nor specially requested." (Landauer Aff. ¶ 14.)

### 5. Dr. Landauer's Treatment After October 24, 2017 Assault

Harvey alleges that he was physically and sexually assaulted on October 24, 2017, by his cellmate. He states that Dr. Landauer refused to see him afterward or to send him to an outside medical provider. (Compl. ¶ 19.) Harvey's medical record states that Harvey reported on October 24 that his cellmate punched him after Mr. Harvey "turned him down for sex." (Med. Rec. 50.) On that date, he was examined by T. Gibson, RN, who determined that a referral to a physician was not required. Thus, she did not notify Dr. Landauer at that time. Approximately one week later, on November 1, Harvey reported to Nurse Damon that he had been sexually assaulted during the same assault. According to Dr. Landauer, "[t]his was the first time Mr. Harvey alleged a sexual assault, and Nurse Damon notified mental health and security." (Med. Rec. 51.) Mr. Harvey also was seen on November 1 by an outside physician assistant, Higginson, via a telemedicine appointment, for a regular chronic infectious disease follow-up. (Med. Rec. 12–13.) At that time, Higginson noted that Harvey "stated that he was physically and sexually assaulted by another inmate on 10/24/17, and stated that he has informed medical and psychology staff concerning the assault." (Med. Rec. 12; Landauer Aff. ¶ 21.)

Dr. Landauer avers that she did not learn of the assault until November 13, when she reviewed Higginson's note. (Landauer Aff. ¶¶ 21–22.) She then examined Harvey during a regularly scheduled chronic care visit on November 20, and she ordered the laboratory tests per Higginson's recommendations. She states that "[n]othing in Harvey's presentation indicated that he needed to be seen by any outside medical treater, or that he needed further care and treatment related to the October 24, 2017 incident." (Landauer Aff. ¶ 23.)

II.  DISCUSSION

## A.  Motion for Summary Judgment

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[12]  A material fact is one that "might affect the outcome of the suit under the governing law."  *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute of material fact is "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party.  *Anderson*, 477 U.S. at 248–49.

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), 56(e).  All inferences must be viewed in a light most favorable to the non-moving party, but the nonmovant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."  *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

## B.  Eighth Amendment

"It is beyond debate that a prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment."  *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019).  To demonstrate deliberate indifference, an inmate must show that (1) he has a medical condition that has been "diagnosed by a physician as mandating

---

[12]  The court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted.  *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" and (2) the defendant "had actual knowledge of the plaintiff's serious medical needs and the related risks, but nevertheless disregarded them." *Id.* at 356–57.  The first component is an objective inquiry and the second is subjective. *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017).

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994).  "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997).  To qualify as deliberate indifference, the health care provider's treatment "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

### 1.   Hamilton's Motion for Summary Judgment

According to Harvey's medical records and Hamilton's affidavit, Hamilton first interacted with Harvey the day after the incident, on July 22, when Hamilton verified orders documented by another nurse and administered Harvey's pain medication and antibiotic.  Hamilton also administered medications to Harvey on July 23, 27, and 28.  On these dates, Hamilton noted in Harvey's chart his observations concerning Harvey's demeanor and the status of his injuries, and also continued to note when Harvey was complaining of discomfort and/or pain and what his reported pain was on a scale of 1 to 10.  On July 29, Harvey removed some of his own sutures against medical advice, although he contends that he did so because the sutures were causing him pain.  As noted, on July 31, an appointment was made for Harvey with UVA ENT, after both Augusta Health Center ENT and UVA neurosurgery refused to see him.

Hamilton next treated Harvey on August 1.  On that date, the pharmacy did not have

14

Harvey's pain medication, so Hamilton could not administer it.  Hamilton next treated Harvey on August 14, two weeks later, again administering his medication.  On that date, Hamilton also reviewed Harvey's report from UVA ENT and forwarded it to Dr. Landauer.  That was the last date that Mr. Hamilton saw Harvey in relation to Harvey's injuries from the July 21 altercation.

In his affidavit, Hamilton notes that, as a registered nurse, he had no ability to prescribe different or additional medication for Harvey.[13]  He also avers the following with regard to Harvey's allegation that he ignored his requests for pain medication or failed to pass on those requests:

> Pursuant to my nursing habit and practice, if Mr. Harvey had asked me for different medication or indicated that his current pain medication was ineffective I would have documented that comment and passed it on to a physician.  *See, e.g.*, Med. Rec. 71–72 (documenting Harvey's comments regarding pain medication).  Based on the fact that no documentation exits indicating that Mr. Harvey made requests of me regarding his pain medication, I do not believe any were made.  Thus, I deny Mr. Harvey's allegation that I refused to pass on such a request.
> I reviewed the 106 pages of grievances Mr. Harvey filed with his Complaint.  I did not respond to any of those grievances.

(Hamilton Aff. ¶¶ 21–22, Dkt. No. 171-4.)

In his opposition, Harvey has provided documents to contradict Hamilton's assertion that Harvey never made requests of him regarding his pain medication.  Specifically, he points to two "emergency grievances" he filed complaining about needing pain medication, to which Hamilton responded, telling Harvey that his complaints did not constitute an emergency, and he should submit a sick call request.  (Dkt. No. 6-1, at 9, 23.)

In support of his assertion that Hamilton's affidavit is false, Harvey claims that the

---

[13]  In his opposition, Harvey explains that he is not asserting that Hamilton should have prescribed him different or additional medication; his complaint is that Hamilton did not "administer" him proper medication he had already been prescribed or pass on his request for more or different medication to help alleviate his pain.

15

grievances were attached to his "March 2 Complaint."[14]  In fact, they are located at Dkt. No. 6-1, but that document is simply docketed as "Additional Evidence" and Hamilton's affidavit said he reviewed the grievances attached to the *complaint*, which did not include those two documents.  In any event, the two grievances, dated August 1 and August 20, 2017, make clear that Hamilton was made aware of Harvey's request for additional medicine.  And there is no indication in the medical records or elsewhere that Hamilton passed on that information to a physician.

Thus, as to Harvey's pain medication, the claim against Hamilton boils down to whether he was deliberately indifferent by: (1) failing to give Harvey his painkiller medicine on August 1, the date the pharmacy had none; and (2) answering Harvey's requests, set forth in his August 1 and August 20 emergency grievances, by instructing Harvey to submit a sick call request, rather than addressing the request directly or passing it on.[15]  As to any delay in obtaining outside treatment, the claim against Hamilton is based on his alleged failure to take some unspecified action to secure an earlier appointment with an outside provider and Hamilton's "lie" in responding to one of Harvey's grievances where he stated that the UVA ENT department had refused him an appointment.

In evaluating these allegations as an Eighth Amendment claim, and turning to the first prong of Harvey's claim—which requires that he had a sufficiently serious medical condition or need—it is worth noting that some courts have concluded that a delay in treating a broken nose alone would not constitute a sufficiently serious medical condition for Eighth Amendment purposes.  *See, e.g.*, *Villalobos v. W. Reg'l Jail*, No. CV 3:18-01385, 2019 WL 2574202, at *7–8 (S.D.W. Va. May 24,

---

[14]  The date set out by Harvey looks like March 22, but there was no March 22 filing, and the court believes Harvey unsuccessfully attempted to delete the first 2 and replace it with a space.

[15]  In Hamilton's motion for summary judgment, he did not address the legal significance of his responses to the grievances.  Instead, he asserted—incorrectly, as now noted—that he never responded to any grievances.  Nor did Hamilton file any reply responding to Harvey's arguments on the point.  Nonetheless, the record is sufficient to allow the court to conclude that no reasonable jury could find for Harvey on his Eighth Amendment claim against Hamilton.

2019), *report and recommendation adopted Villalobos v. W. Reg'l Jail*, No. CV 3:18-1385, 2019 WL 2579153 (S.D.W. Va. June 21, 2019) (concluding that a broken nose without displacement is not a serious medical condition); *Burt v. Tarpley*, No. 1:15cv1-24, 2017 WL 1397953, * 2 (E.D. Va. April 17, 2017) ("[I]t is questionable that a broken nose is a sufficiently serious condition to warrant constitutional protection."); *Thomas v. Comm'r, Ala. Dept. of Corrs.*, No. 1:15-cv-00199-CLS-TMP, 2016 WL 2962889, at *8 (N.D. Ala. Jan. 26, 2016) (finding plaintiff's desire for surgery to correct any facial deformity resulting from a broken nose for aesthetic purposes and to correct deformity affecting plaintiff's speech and ability to breathe from his right nostril was not a serious medical need), *report and recommendation adopted by Thomas v. Comm'r*, 2016 WL 2939629 (N.D. Ala. May 20, 2016).  The court assumes for purposes of this opinion, however, that Harvey's lacerations and broken nose, which included a minimal displacement, as well as his related pain, constituted a serious medical condition.  The court further recognizes that a delay in treatment for the break (as opposed to the denial of medical treatment) can satisfy the objective component where the delay resulted in some "substantial harm" or "frequent complaints of severe pain."  *See, e.g.*, *Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (citations omitted).  In any event, none of the Mediko defendants have sought summary judgment on the grounds that the objective prong is not satisfied with regard to Harvey's laceration, broken nose, and related pain.  So, for purposes of this opinion, the court treats Harvey as satisfying the first prong of his Eighth Amendment claims.

Even construing the facts in the light most favorable to Harvey, however, the court concludes that Hamilton's actions are insufficient to satisfy the second prong of the claim: that Hamilton was deliberately indifferent to a serious medical need of Harvey's.  Turning first to the pain medication claim, Hamilton did not treat Harvey on July 31, and his failure to administer the medicine on August 1 appears to be the direct result of the pharmacy being out of the medicine, and perhaps confusion in the record over the length of Dr. Arakaky's prescription.  While the lack of

medicine for two days understandably increased Harvey's pain, Hamilton's response to the August 1 grievance was not deliberate indifference.  Even if he had addressed the grievance right then, it does not appear there was anything he could do at that point.  As he notes, he could not himself prescribe anything for pain, and Dr. Landauer (the very same day) extended Harvey's Norco prescription, which Harvey was able to receive at the first available pill window the next day.  Again, Harvey may have felt that he needed more pain medication immediately, but he was seen by a physician the very day he complained, he was being housed in the infirmary at the time, and he was told he would receive his new pills the following morning, which he did.  In light of those facts, no reasonable factfinder could conclude that Hamilton's response to his grievance (which was simply to tell Harvey to submit a sick call request) was deliberate indifference.

As to the August 20 emergency grievance, Harvey stated in it that he is "experiencing an excessive level of chronic pain.  The pain medication that Dr. Landauer had me on discontinued three (3) days ago.  I'm also having additional pain from the nerve damage in my right eye and my front tooth.  I need something for my pain as soon as possible."  (Dkt. No. 6-1, at 23.)  Hamilton checked a box stating that the grievance did not meet the definition for an emergency and directed Harvey to submit a sick call request.  Harvey made such a request, which was received on August 21.  (Dkt. No. 190-2, at 8.)  He was scheduled for sick call, and he was seen by Dr. Landauer on August 23.  (Med Rec. 56.)  He complained of tooth discomfort on that day, and Dr. Landauer prescribed Naproxen (an anti-inflammatory and painkiller) twice per day for thirty days.  At worst, then, Hamilton's response to Harvey's August 20 emergency grievance resulted in a three-day delay to see the physician, who prescribed pain medicine at that time.[16]

---

[16]  Hamilton is not deliberately indifferent because he required Harvey to utilize the proper procedure for submitting his grievances and for concluding that the "emergency" requests were not emergencies, particularly because they complained about chronic pain.  Put differently, Hamilton was permitted to require Harvey to submit a request for a change to medication through the proper channels.  Indeed, when Harvey subsequently did so, he quickly obtained an appointment with Dr. Landauer and a new prescription.  If every complaint of pain were required to be treated as an emergency, nearly every medical problem would qualify.  The constitution sets a much higher standard, prohibiting

In reviewing Hamilton's conduct, the court easily concludes that it does not rise to the level of deliberate indifference.  While Hamilton knew that Harvey was complaining of pain, Harvey either was or recently had been examined and treated by Dr. Landauer, who was prescribing and adjusting prescriptions for him, including painkillers.  Hamilton's conduct in not giving Harvey medication on a single date when it was unavailable, and his requiring Harvey to submit sick call requests to see the doctor to adjust his prescriptions, is simply not conduct "so grossly incompetent, inadequate, or excessive as to shock the conscience," *Miltier*, 896 F.2d at 851.

As to the delay in obtaining outside surgery, the topic to which Harvey devotes much of his opposition, the court first notes that he does not allege, nor present anything to show, that Hamilton himself had anything to do with his referral to outside providers.  But even if Hamilton was somehow responsible for ensuring that such appointments were timely made, Harvey's arguments about having his "needed surgery" delayed is based on an inaccurate characterization of the medical records.  First of all, as noted in the factual background, Harvey has not pointed to any medical records containing a statement by the ER physician that *surgery* was required at all, let alone that surgery was required immediately.  Indeed, Dr. Rylak has provided an affidavit stating that "Harvey's facial injuries were not life threatening and did not require admission to the hospital.  His facial fractures were of the type that are regularly treated on an outpatient basis."  (Rylak Aff. ¶ 14, Dkt. No. 73-1.)  Even that does not provide evidence that anyone at ACC was advised by Dr. Rylak that he needed *surgery*, immediately or at all.

Nor do the records even indicate that a follow-up outside appointment should have *occurred* on Monday, July 24.  The discharge notes simply list UVa neurosurgery's number and state: "Please call on Monday for next available appointment.  Fractures involve the frontal sinus and

---

instead only deliberate indifference to a medical condition that has been "diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Gordon*, 937 F.3d at 356.

nasal bones." (Med. Rec. 27.)  The notes also directed to call Augusta Otolaryngology Assoc. "on Monday for next available appointment." (*Id.*)  It certainly would not be uncommon, even for non-prisoners, to receive a "next-available appointment" that is weeks later.

As to the outside appointment, then, the medical record would have alerted Hamilton to the fact that an outside appointment was needed promptly, but the process for obtaining such an appointment was begun by ACC medical staff on the same date the ER physician had directed, on July 24, by submitting the MCRU; the appointment itself was made within one week of that, on July 31; and the appointment was held two weeks later, August 14.  Nothing in the record would have alerted Hamilton to believe that the appointment had to be held any sooner, nor does anything in the record suggest that he could have done anything to speed that appointment.  *Cf. Riles v. Buchanan*, 656 F. App'x 577, 581–82 (2d Cir. 2016) (affirming dismissal of Eighth Amendment claim and reasoning that two physicians were not deliberately indifferent to inmate's claim that his broken nose, an x-ray of which revealed "multiple nose fractures of the right and left nasal bone, mildly displaced," was not promptly treated, ultimately resulting in a loss of taste and smell, because such injuries ordinarily heal without medical intervention).

To be sure, there was about a week's delay in obtaining that appointment (from July 24 to July 31), whether because of the unavailability of an earlier appointment with UVA ENT, a delay in obtaining internal approval for the appointment, or a delay by someone at ACC in making the appointment.  But regardless of the reason, nothing in the medical records or in Harvey's allegations plausibly render *Hamilton* responsible for that delay.

Furthermore, even if the delay occurred because someone in the ACC medical department failed to call before July 31, that shows—at most—negligence in the alleged delay.  There is nothing to support a finding that the delay was intentional or deliberate.  It is well recognized that "negligent medical diagnoses or treatment, without more, do not constitute deliberate indifference."

*Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir. 2008).  Instead, to qualify as deliberate indifference, the prison official's conduct must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."  *Miltier*, 896 F.2d at 851. Throughout the time that Harvey was awaiting the scheduling of his appointment—and for a week afterward—he was housed in the infirmary, under observation and monitored by nurses and other medical personnel, and was given (with the exception of July 31 and August 1) narcotic painkiller, and other medicines for his injuries.  Regardless of whose fault it was that the appointment was not actually scheduled until July 31, that fact, neither alone nor in combination with the other facts here, does not establish deliberate indifference.

Lastly, Hamilton's alleged "lie" concerning the refusal of Harvey's appointment does not give rise to an Eighth Amendment claim.  Harvey is correct that Hamilton mistakenly wrote, in responding to Harvey's August 1, 2017 emergency grievance, that the UVA ENT department had refused his appointment.  (Dkt. No. 6-1, at 9.)  In fact, it was the UVA *neurosurgery* department that refused him an appointment, according to the medical records.  But this misstatement, whether intentional or inadvertent, does not violate any constitutional rights of Harvey's.

For all of the foregoing reasons, Hamilton's motion for summary judgment will be granted.

### 2.  Dr. Landauer's Motion for Summary Judgment

The court turns next to Dr. Landauer's motion.  In it, she argues that she is entitled to summary judgment because she was not deliberately indifferent to any of Harvey's serious medical needs.  Harvey disagrees and claims that she has exhibited a pattern and practice throughout his treatment of ignoring his pain, failing to treat him, and failing to obtain adequate treatment.

#### a.  *Failure to refer to an outside provider and to provide adequate pain relief*

Starting where the analysis of Hamilton's motion left off—the claim concerning the outside referral—Dr. Landauer was still on leave for the first ten days after Harvey returned to the ER, until

August 1, 2017.  Thus, neither any decision made in that time-frame nor any failure to obtain an appointment in that time-frame is attributable to her.  Moreover, the undisputed records show that, upon her return, she wrote Harvey a new prescription on her very first day, which she later renewed.  She also reviewed his chart and made a note to follow-up about his ENT appointment.  She learned two days later that he already had a scheduled appointment, and she submitted a second UMCR to ensure that appointment had the proper approval paperwork.

The appointment was held a mere two weeks after Dr. Landauer's return to ACC, and no evidence suggests that Dr. Landauer could have accelerated the timing of that appointment.  Thus, Dr. Landauer's actions prior to the Dr. Park appointment do not exhibit deliberate indifference.  This case is similar to *Bright v. Brooks*, No. 3:18CV657, 2020 WL 390896 (E.D. Va. Jan. 23, 2020), in which the district court granted summary judgment in favor of the physician who treated the plaintiff for a broken toe.  There, the prison physician acted promptly to schedule an appointment, the appointment was scheduled for approximately one month out, and thereafter, a request for surgery was approved and the surgery successfully performed.  2020 WL 390896, at *6.  Both before and after the surgery, the physician monitored the prisoner's condition and prescribed pain medication to alleviate discomfort.  *Id.*  On those facts, the court concluded that the physician was not deliberately indifferent and thus was entitled to summary judgment on the plaintiff's Eighth Amendment claims.

The same is true here.  Dr. Landauer promptly acted to schedule the appointment, the appointment was held (although surgery was determined not to be appropriate here), and she continued to monitor Harvey's condition before and after the appointment.  After Dr. Park's report, which stated that no additional treatment was needed by him, it was Dr. Landauer's determination that no further outside treatment was needed for Harvey.  That he may disagree with her conclusion does not mean she was deliberately indifferent.

### b. *Failure to issue a bottom bunk pass*

As to Dr. Landauer's alleged failure not to issue Harvey a bunk pass upon his request, Dr. Landauer has explained that nothing in Harvey's physical condition or presentation convinced her that Harvey needed assignment to a bottom bunk. Harvey does not point to any lower body medical injury that prevented him from getting in and out of an upper bunk. He simply says that he should not have been "forced to climb up and down a steel rack all day" with his "serious head injuries." (Dkt. No. 189 at 3.)

At most, then, Harvey takes issue with her professional judgment that he did not need a bottom bunk pass. Harvey's disagreement with the treatment he has received, however, cannot support an Eighth Amendment claim. Indeed, it is well-established that mere disagreement with a prescribed course of treatment is insufficient to establish an Eighth Amendment claim of deliberate indifference. *See Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (finding that a prisoner's claim "is essentially a disagreement between an inmate and a physician over the inmate's proper medical care, and we consistently have found such disagreements to fall short of showing deliberate indifference") (internal quotations and alterations omitted). If a medical provider has a legitimate medical reason for a certain course of treatment, an inmate's disagreement with the treatment is not sufficient to succeed on an Eighth Amendment claim. *Rush v. Vandevander*, Civil Action No. 7:08CV00053, 2008 WL 495651, at *2 (W.D. Va. Feb. 21, 2008) (citing *Perkins v. Kansas Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999)); *see also Taylor v. Barnett*, 105 F. Supp. 2d 483, 488 (E.D. Va. 2000). Summary judgment for Dr. Landauer on this claim is required.

### c. *Alleged Failure to Treat Harvey or Refer Him to Outside Provider After October 24, 2017 Incident*

Dr. Landauer explains that she did not learn of the October 24 assault until November 13. Moreover, Harvey has not presented any evidence to suggest that she was willfully blind to that information prior to that date or failed to take some action to learn of the assault. Within one week

of learning of the assault, she examined Harvey and has offered her opinion that he needed no further medical treatment as a result of that alleged assault.  Once again, Harvey disagrees with that assessment, but, as with the request for a bottom bunk, he does not demonstrate anything other than a disagreement with her over the best course of medical treatment.  Again, such a disagreement does not rise to the level of deliberate indifference.  *See Jackson*, 775 F.3d at 178.

Harvey insists, though, that Dr. Landauer's conduct exhibits a consistent pattern of negligent or reckless conduct, which he claims establishes deliberate indifference.  (Dkt. No. 190 at 9.)  He cites to cases stating that a continuing pattern of negligent or reckless conduct can support a deliberate indifference claim.  None of the cases cited by Harvey are Fourth Circuit cases, but even if that were the law in the Fourth Circuit, the cases cited by Harvey are factually distinguishable. On the facts here, there is no consistent pattern that shows that Dr. Landauer knew of and subjectively appreciated a serious medical need of Harvey's and was deliberately indifferent to it. For all of these reasons, the court will grant Dr. Landauer's motion for summary judgment.

### 3.  Shipp's Motion for Summary Judgment

Harvey's claims against Shipp are that she lied in responding to his grievances about his outside appointments and his pain medication.  To the extent that his claims can be construed as an assertion that Shipp should have taken some additional action in response to his grievances, however, he has not shown that she was deliberately indifferent.  First of all, Shipp has explained her responses to the grievances Harvey submitted, and explains why her responses were accurate, and indeed, to a very large degree her answers are in fact supported by the records she cites and the information available to her at that time.  In any event, even if she "lied" about when the appointment was made or whether he received all his medications, he has not shown that she was deliberately indifferent toward his serious medical needs.  The fact that he did not receive medicine on several days does not mean that she was deliberately indifferent.  Moreover, Harvey does not

identify any way in which he was harmed by her false or incorrect responses to his grievances, nor does he explain what difference it would have made to his treatment had Shipp responded differently to his grievances.

His complaint does not allege that Shipp should be held liable for the delay in his obtaining outside treatment, but for all of the reasons set forth in discussing this claim in the context of Hamilton's motion, summary judgment for Shipp on this issue is also proper.

### III.  CONCLUSION

For the reasons stated above, the motions for summary judgment by Landauer, Shipp, and Hamilton will be granted and those defendants dismissed from this case.  An appropriate order will be entered.

Entered: May 15, 2020.

*/s/ Elizabeth K. Dillon*

Elizabeth K. Dillon
United States District Judge