IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| TAMAR DEVELL HARVEY, | ) | |
|     Plaintiff, | ) | Civil Action No. 7:18-cv-00097 |
| | ) | |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| C.D. WHITLOCK, *et al.*, | ) | United States District Judge |
|     Defendants. | ) | |

**MEMORANDUM OPINION**

*Pro se* plaintiff Tamar Devell Harvey brought this civil rights action asserting claims pursuant to 42 U.S.C. § 1983 against a number of defendants.[1] Some defendants and claims have been dismissed. This opinion addresses a motion for summary judgment filed by defendant E. Burch, who was an employee at Augusta Correctional Center ("ACC") where Harvey was housed at all relevant times. Burch is named only in Claim One, which alleges that Burch violated Harvey's Eighth Amendment rights when he failed to protect Harvey from an attack by another offender on July 21, 2017.

Upon review of the record, the court concludes that the undisputed allegations establish that Burch did not violate Harvey's Eighth Amendment rights. For this reason, addressed in more detail below, the court will grant Burch's motion for summary judgment.

I. BACKGROUND[2]

On July 21, 2017, Harvey was assaulted by another ACC inmate, Offender Poe, who used a

---

[1] The remaining claims against the remaining parties are set forth in the court's July 7, 2020 memorandum opinion and order (Dkt. No. 313 at 3–4.) Some of the dismissed defendants were subject to a different complaint (Dkt. No. 1, as amended by Dkt. No. 19). (Dkt. No. 195 at 7.) All remaining claims against Burch and the other remaining defendants are set forth in Harvey's Amended Complaint (Dkt. No. 196).

[2] The summary judgment record includes Burch's affidavit, the *executed* copy of which was submitted weeks after his motion. (Dkt. No. 369 (executed affidavit); *see also* Dkt. No. 355-1 (unexecuted affidavit).) Burch also specifically incorporates the affidavits of J. Clifton and F. Russell (Dkt. Nos. 100-1, 100-3), previously submitted in the case. (Mem. Supp. Mot. Summ. J. 2, Dkt. Doc. 355.) Harvey's opposition is signed under the penalty of perjury (Dkt. No. 362 at 16), and he also has submitted an affidavit in support of his opposition (Dkt. No. 363).

padlock and razor blades during the attack. The attack resulted in lacerations to Harvey's face requiring stitches, a broken nose, deviated septum, and an injury to one of Harvey's teeth..

The attack occurred after lunch on July 21, 2017, at around 1:00 p.m., in the M/N building where Harvey was housed. The M/N building housed approximately 600 of the 1300 offenders incarcerated at ACC at the time. Poe was not housed in the building, and he was not authorized to be in it on the date of the attack. (Russell Aff. ¶ 5, Dkt. No. 100-3.) But he apparently followed Harvey back from the cafeteria and gained entrance to the M/N building during a period of what is called "mass movement." "During mass movement, all offenders are observed by corrections officers and are shaken down as they enter the building." (Russell Aff. ¶¶ 4–5.)

Burch explained that VDOC policies require officers to pat down inmates as they enter the building for suspicious objects that inmates are not authorized to possess. (Burch Aff. ¶ 10, Dkt. No. 369.) Burch has no recollection of patting down Poe on July 21, 2017, but a video from the M/N building entryway at the relevant time reflects that Burch did so as Poe entered the building. Burch did not discover the weapons Poe apparently had on his person. Poe then followed Harvey up a set of stairs and attacked him on the third floor, at the top of the stairs.

Harvey alleges that three actions of Burch's exhibited deliberate indifference toward him, pointing for support primarily to his own affidavit and to two videos that are part of the record. First, Harvey alleges that Burch "allowed" Poe to possess the weapons by failing to perform a proper pat-down. Harvey does not provide a copy of any VDOC policy setting forth what a "proper" pat-down entails. According to him, though, VDOC policies for pat-downs require an offender to raise his arms like an airplane, and for the officer to feel the sides of the offender's hip area, then his pockets, and then feel down the sides of the offender's legs until his hands reach the top of the offender's shoes. (Opp'n 5.) Harvey insists that the video shows that Poe never raises his hands and that Burch never feels past Poe's waist.

2

The video of Burch's pat-down of Poe is choppy, in that (like all the videos in the record), it actually consists of a series of still photos taken at consistent intervals (three per second for this particular video). Harvey's characterization of the video is not accurate, however. First of all, Poe's legs are not visible during the pat-down, but by the end of the search, Burch clearly is bent over at the waist toward the floor and appears to have felt down the sides of Poe's legs. Moreover, the video reflects Burch patting numerous other offenders before (and after) Poe, and he performs the same actions with each, including feeling down the sides of the offenders' legs. Also, Poe's right arm is raised as he approaches Burch, and Poe's left arm may not have been completely extended during the pat-down, but it was at least partially raised. (Entryway Video, 13:00:34–36, Dkt. No. 58.)

Nonetheless, construing the evidence in the light most favorable to Harvey, there is some evidence that Burch did not conduct a proper pat-down in that he failed to require Poe's left arm to be completely extended, crediting Harvey's assertion that is required.[3] It is further undisputed that Burch failed to discover the weapons on Poe's person, although the record does not disclose where on his body Poe had concealed them.

Burch states that, had he felt any weapon on Poe's person, he would have confiscated it because weapons pose a risk to other offenders and to correctional staff. Harvey alleges that Burch purposefully or intentionally allowed Poe to keep the weapons. Harvey argues that "there is no way [Burch] didn't feel [the contraband] during the patdown, because Poe had in his possession: 1. a black pair of gloves, 2. a bulky metal padlock, and 3. at least 10-ten razor blades." (Opp'n 4.) Other than insisting that Burch must have felt them, though, Harvey offers no evidence to show that Burch knew Poe had these materials or that he intentionally allowed Poe to retain them. Nor does

---

[3] Very few of the offenders searched had their arms fully extended or straight out to the sides; most just lifted both arms but did not fully extend them and/or did not have them completely horizontal to the floor.

3

Harvey offer any logical reason why Burch knowingly would "allow" a prisoner to retain dangerous weapons on his person.

The second action by Burch that Harvey challenges was Burch's "allowing" Poe to be in the M/N building. Burch does not dispute that Poe was not authorized to be in the building. He states only that he was not aware that Poe was not permitted in the M/N building on that date. Moreover, no party has pointed to any evidence as to what procedures should be followed to ensure offenders do not travel to a building where they are not authorized, or who is responsible for ensuring that does not occur. It is not clear to the court, therefore, that this was Burch's failure, although Harvey points the finger at Burch for allowing Poe into the building.

The third and final action that Harvey challenges is Burch's failure to intervene sooner once the attack began. In his affidavit, Burch states that, when he heard yelling coming from the stairway, he "immediately ran up the stairs to investigate." (Burch Aff. ¶ 6.) When he reached the top of the stairs, Burch observed Poe leaving the stairwell and realized that Poe and Harvey had been in an altercation. By the time he got to the top of the stairs, the altercation had ended. (*Id.* ¶ 7.) Burch told Poe to stop as Poe ran past him down the stairs, but Poe did not. Burch went back down the stairs briefly and saw where Poe was headed, and he then radioed other staff for assistance. (*Id.* ¶ 8.)

Harvey insists that Burch did not respond immediately. He argues that the video—which does not include any audio—reflects that it was a phone call from Harvey's counselor (who could see the fight from her third-floor office) that alerted Burch to the altercation. Harvey insists that only upon receiving that call did Burch go up the stairs. (Opp'n 3, Dkt. No. 362.) The video does not show Burch actually talking on any phone, although it arguably supports Harvey's account. At approximately 13:01:12 (nine seconds after the fight began), Burch moves to the other side of the hallway, where Harvey suggests the phone was. He is then mostly off-camera until 13:01:20, when

4

he turns back toward the stairs and walks quickly to the stairs and starts going up them, with his first foot reaching the first stair at 13:01:23. In response to one of Harvey's grievances, moreover, and as part of the investigation of the incident, Major Russell included that "Counselor Butler notified M&N entryway, Shift Commander and Lt. Burgandine as she could see two offenders fighting in the stairway from her office." (Dkt. No. 1-1, at 49.) To summarize, then, and although it is not directly reflected on the video, the evidence supports that less than ten seconds after the fight began, Burch answered a call from the counselor and presumably spoke with her for some period of time, and eight seconds after the call began, he began running up the stairs to investigate.

Harvey notes that Burch has testified that he heard yelling, and Harvey avers that he was screaming for help the entire time of the assault.[4] From this, he concludes that Burch must have heard him yelling for help the entire time, but Burch ignored the yelling until the counselor called him. Thus, Harvey's argument continues, Burch must have purposefully waited to respond to the altercation.

## II. DISCUSSION

### A. Motion for Summary Judgment

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[5] A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*,

---

[4] Harvey insists he was "screaming" and not "yelling." (Opp'n 3.) Those words are often used interchangeably, and the different terminology does not give rise to a material dispute of fact.

[5] The court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted. *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

652 F.3d 524, 531 (4th Cir. 2011) (en banc).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990).

**B. Eighth Amendment Claim**

Harvey's claim against Burch is brought pursuant to 42 U.S.C. § 1983. To prevail on such a claim,

> a plaintiff must show, first, that he was deprived of a right secured by the constitution or laws of the United States, and second, that the defendant acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 2254–55, 101 L.Ed.2d 40 (1988).

*Conner v. Donnelly*, 42 F.3d 220, 223 (4th Cir. 1995).

Harvey alleges that Burch violated his Eighth Amendment rights. Under this amendment, "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quotation marks and citation omitted). But not every "injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834.

To succeed on a claim under the Eighth Amendment arising from failure to protect, a plaintiff must satisfy two requirements, an objective component and a subjective component. *Id.* at 834. "First, the deprivation alleged must be, objectively, sufficiently serious," (objective component) and second, "the prison official must have a sufficiently culpable state of mind" (subjective component). *Id.* (quotation marks and citation omitted).

The assault on Harvey and his resulting injuries satisfy the objective component, and Burch does not argue to the contrary. (*See generally* Mem. Supp. Mot. Summ. J., Dkt. No. 355.) As for the subjective component, deliberate indifference is "something more than mere negligence," but can be "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 834–35. A prison official acts with deliberate indifference if he has "actual knowledge that an inmate faces substantial risk of serious harm and disregards the risk by failing to take reasonable measures to abate it." *Id.* at 835. The test is not "whether an official knew or should have known of the possibility of harm, but whether he did, in fact, know of it and consciously disregard[ed] that risk." *Id.* The official must be aware of facts from which "the inference could be drawn that a substantial risk of serious harm exists" and he must also "draw the inference." *Id.* at 837.

An inmate may prove deliberate indifference through direct or circumstantial evidence, and "[d]irect evidence of actual knowledge is not required." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). The plaintiff may satisfy the deliberate indifference element with evidence that the challenged circumstances created a "substantial risk" of harm that "was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Id.* Even without direct evidence, "an injury might be so obvious that the factfinder could conclude that the [official] did know of it because he could not have failed to know of it." *Id.*

Applying those standards here, the court concludes that Burch is entitled to summary judgment. Harvey presents no evidence—and the videos do not provide circumstantial evidence— to support any finding that Burch knew of a risk to Harvey specifically (or other inmates) and failed to take action to prevent it.

7

In support of his assertion that Burch should have known Harvey was likely to be attacked, Harvey points to a regular grievance he submitted the day before the attack, on July 20, 2017, in which he complained that another inmate "Offender Hubert," (who was later identified as Offender Hubbard) had threatened Harvey. According to Harvey's grievance, Hubbard told him on Tuesday, July 18 that if he (Hubbard) got moved out of the M/N building, "me and my boys are going to jump you and F you up!!!" (Dkt. No. 100-3, at 5.)

Regardless of whether this grievance should have put other jail officials on notice that Harvey was likely to be attacked or that Poe was likely to attack him,[6] there is no evidence whatsoever that Burch had knowledge of the grievance or its contents at the time of the attack. In short, then, there is no evidence that Burch had any knowledge that Poe was likely to attack anyone, let alone that he was likely to attack Harvey, and there is no evidence that Burch had any knowledge that Harvey was likely to be attacked by anyone.

As for the failure to confiscate the weapon from Poe upon patting him down, Harvey conclusorily states that Burch allowed Poe to retain the weapon. But Burch has testified that he did not feel the weapon or know that Poe had one. Moreover, he has testified that he would never intentionally allow an inmate to retain a weapon of any kind if one were discovered during a pat-down. (Burch Aff. ¶ 12.) Not only would a failure to confiscate a weapon violate his duties, but it also would put him, other VDOC staff, and the inmate population at risk of harm or violence. (*Id.*) Harvey points out that the video shows that Burch did not conduct a proper pat-down. It does

---

[6] As explained in Russell's affidavit, this grievance nowhere referenced Poe, although it referenced Hubbard's "boys." (Russell Aff. ¶ 8, Dkt. No. 100-3 & Encl. A, Dkt. No. 100-3 at 5; *see also* Clifton Aff. ¶ 4, Dkt. No. 100-1 (explaining that his investigation of the incident revealed that "Harvey never complained to staff at [ACC] that he feared offender Poe or that he had any problem with Poe.").) Also, Harvey did not submit the issue about the threat from Hubbard as an emergency grievance, which staff would have been required to respond to within eight hours. Instead, he submitted it as a regular grievance, and it was not even received in the grievance office until July 21, 2017, the day of the attack. (Russell Aff. ¶ 8.) By the time the grievance was received, Hubbard already had been moved from the M/N building. The grievance was given to security to investigate, but before they had the opportunity to interview Harvey, the incident with Poe had already occurred. (*Id.* ¶ 9.)

8

appear, based on the video, that Poe's left arm was not extended fully during the pat-down, as required by VDOC policy. But even if Burch failed to properly pat down Poe, that negligent conduct does not support an Eighth Amendment violation. There is simply no evidence that Burch intentionally allowed Poe to retain the weapon or knew that Poe possessed one. The facts before the court would not allow a jury to so conclude.

Similarly, Burch has alleged that he did not know Poe was not permitted to be in the M/N building, and Harvey has presented no evidence to support an assertion that Burch should have known that, or that it was in any way his responsibility to police which inmates may enter which buildings.

In the prison setting, there is always a risk of inmate-on-inmate violence, but here, as already noted, there is no evidence that Burch had any actual knowledge that Poe posed a risk to anyone or that Harvey was at risk of an attack. As such, he was neither aware of facts from which "the inference could be drawn that a substantial risk of harm" existed, nor did he draw such an inference. *See Farmer*, 511 U.S. at 837. In the absence of such knowledge, Burch cannot be held liable for an Eighth Amendment violation. *See id.*

With regard to Burch's alleged failure to intervene sooner in the altercation, the Fourth Circuit has provided guidance on such claims:

> In failure-to-protect cases, "prison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm." *Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995); *see also Winfield v. Bass*, 106 F.3d 525, 532 (4th Cir. 1997) (en banc) ("[S]uch heroic measures are not constitutionally required."). But "completely failing to take any action" to stop an ongoing assault on a prisoner can amount to deliberate indifference. *Winfield*, 106 F.3d at 532; *see also, e.g.*, *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 773 (4th Cir. 2003) ("[A] correctional officer who stands by as a passive observer and takes no action whatsoever to intervene during an assault violates the [Eighth Amendment] rights of the victim inmate." ); *Williams v. Mueller*, 13 F.3d 1214, 1216 (8th Cir. 1994) ("A prison official acts with deliberate indifference to an inmate's safety when the official is

9

> present at the time of an assault and fails to intervene or otherwise act to end the assault."); *cf. Prosser*, 70 F.3d at 1008–09 (finding no deliberate indifference where prison guard ran to get help immediately after inmate threw first punch at plaintiff). Thus, courts have found that "a corrections officer's failure to intervene in a beating can be the basis of [§ 1983] liability" if the officer had a reasonable opportunity to act and "simply refused to do so." *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002).

*Raynor v. Pugh*, 817 F.3d 123, 128 (4th Cir. 2016) (alterations in original). Applying *Raynor*, another district court granted summary judgment to a correctional officer who saw the plaintiff and another inmate fighting, but declined to intervene, instead notifying command staff about the altercation and monitoring the situation until the Emergency Response Team arrived. *Reed v. Robinson*, No. 3:20CV200, 2021 WL 3192166 (E.D. Va. July 28, 2021).

Here, the videos of both incidents provide some important information. First of all, the video of the third floor stairwell, which shows portions of the attack, reflects that the attack lasted twenty-six seconds, from 13:01:03 until 13:01:29. Beginning at 13:01:29, Poe started to go back down the stairs from the third-floor landing, where the attack occurred. He dropped something on the stairs (Harvey says it was a weapon used), turned around to pick it up, and put it in his pocket. At 13:01:37, Poe passed Burch on the second floor landing.

The video that shows what is happening in the entryway reflects that, at 13:01:20, Burch began to go upstairs. It is unclear how long it took him to get up to the third floor, but (assuming the time-stamps on the two videos were properly synched), Burch arrived at the landing just below the third floor at 13:03:37. Moreover, the third floor video clearly shows that Burch rounded the corner from the second floor landing after Poe and Harvey had separated. This is consistent with Burch's statement that, by the time he got there, the incident was over. But even if he stood there for a brief period of time and declined to intervene, he was under no obligation to do so. *Raynor*, 817 F.3d at 128. Burch immediately sought back-up and help for Harvey via the radio, which is reflected in the videos.

Harvey insists that he began screaming the moment the attack started and thus that Burch took too long to come upstairs to investigate. But this argument presupposes that Burch heard him screaming when he first started. At the time of the attack, Burch was two floors away and there were a number of other offenders in the area around Burch and between him and Burch. It is also possible that the "yelling" referenced by Burch in his affidavit was not coming from *Harvey*, but instead was other offenders yelling about the altercation. In short, although Burch says he at some point heard yelling and immediately responded, no evidence supports that Burch actually heard yelling *earlier* and failed to respond.

Based on the entirety of the record before the court, then, the court concludes that no reasonable jury could find in Harvey's favor as to his claim against Burch.

### III.  CONCLUSION

For the reasons stated above, defendant Burch's motion for summary judgment will be granted and he will be dismissed from this case. An appropriate order will be entered.

Entered: August 27, 2021.

/s/ *Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge