IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| TAMAR DEVELL HARVEY, | ) | |
| Plaintiff, | ) | Civil Action No. 7:18-cv-00097 |
| | ) | |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| C.D. WHITLOCK, *et al.*, | ) | United States District Judge |
| Defendants. | ) | |

**MEMORANDUM OPINION**

*Pro se* plaintiff Tamar Devell Harvey brought this civil rights action asserting claims

pursuant to 42 U.S.C. § 1983 against a number of defendants.  Through its rulings on motions for

summary judgment, the court has dismissed some claims and some defendants, including all of

what the court had previously referred to as the "medical defendants."  Now pending before the

court is a motion for summary judgment by the remaining defendants: C.D. Whitlock, Russell,

McDaniel, Peale, J. Woodson, LaCour, H. Clarke, S. Conner, Lewis, and S. Herrick.[1]  (Dkt. No.

338.)  Harvey has responded (Dkt. No. 359), and the motion is ripe for disposition.

For the reasons set forth below, the motion will be granted in part and denied in part.

Specifically, it will be granted as to all remaining claims against all remaining defendants, except it

will be denied as to Harvey's Eighth Amendment claim against Russell in Claim Six, which alleges

that Russell failed to protect him from an attack by another offender on July 21, 2017.  That claim,

as against Russell only, will be set for trial.

I.   BACKGROUND

All of Harvey's claims arise from events that occurred during his incarceration at Augusta

Correctional Center ("ACC").  Most of his remaining claims stem from two separate incidents in

---

[1] Two of defendants' names are misspelled and should be spelled "McDaniel" and "Conner."  The Clerk will
be directed up update the docket accordingly.

which he was assaulted by a fellow prisoner.  The first assault occurred on July 21, 2017, when

Harvey was attacked by Offender Poe, who used a padlock and razor blades during the attack.  The

second assault occurred in Harvey's cell on October 24, 2017, when he alleges he was assaulted and

raped by his cellmate, Offender Monroe.[2]  Harvey complains that certain defendants failed to

protect him from these attacks and that others implemented (or failed to implement) certain policies,

which he says allowed the attacks or contributed to them.  He further alleges that certain defendants

were deliberately indifferent to his medical and dental needs afterward.  Also remaining in the case

are a claim against defendant LaCour, the laundry manager, alleging a failure to provide Harvey

with clean sheets and a claim against defendant Whitlock, based the confiscation of three Bibles

from Harvey on the date of the first attack, July 21, 2017.

More specifically, the claims remaining in the case are as follows:

**Claim Three:**   Between July 21 and 25, 2017, Defendants Whitlock, McDaniel, and Peale violated Harvey's Eighth Amendment rights by refusing him medical care outside of ACC.  (Am. Compl. 18, Dkt. No. 196.)

**Claim Four:**   From July 21, 2017, through February 20, 2018, Defendants Whitlock, Russell, Woodson, McDaniel, Peale, and Conner violated Harvey's Eighth Amendment rights by refusing him medical care outside of ACC for his front tooth and nose.  (*Id.* at 18–19.)

**Claim Five:**   Defendant Whitlock violated Harvey's First Amendment rights by taking and/or refusing Harvey possession of his Bibles on July 21, 2017.  (*Id.* at 19.)

**Claim Six:**   Defendants Whitlock, Russell, and Woodson failed to protect Harvey from the assault by Offender Poe at ACC on July 21, 2017.  (*Id.*)

**Claim Nine:**   Defendant LaCour violated Harvey's Eighth Amendment rights by refusing to give him a clean bed sheet.  (*Id.*)

**Claim Eleven:**   Defendant Herrick violated Harvey's Eighth Amendment rights by refusing to approve Harvey's nose surgery.  (*Id.*)

**Claim Twelve:**   Defendant Lewis violated Harvey's Eighth Amendment rights by failing to

---

[2] Harvey did not report that he had been raped at that time.  (*See* Incident Report, Dkt. No. 339-10, at 3.) When he went to the medical department immediately following the incident, he reported that his cellmate punched him after Mr. Harvey "turned him down for sex." (Med. Rec. 50, Dkt. No. 171-1.)  It was not until one week later, on November 1, that Harvey first reported to Nurse Damon that he had been sexually assaulted during the same assault. (Med. Rec. 12, 51; Landauer Aff. ¶ 21.)

protect Harvey from the attack and rape by Monroe on October 24, 2017.  (*Id.* at 22–23.)

**Claim Sixteen:**   Defendant Clarke violated Harvey's Eighth Amendment rights (apparently related to both attacks) by creating a "state danger" for Harvey.  (*Id.*)

(July 7, 2020 Mem. Op. 3–4, Dkt. No. 313.)[3]

More facts specific to each claim will be discussed in context, but the court sets forth a factual overview first.

**A.  The July 21, 2017 Attack & Harvey's Prior Grievance Outlining a Threat**

On July 20, 2017, Harvey submitted a regular grievance, which was received in the grievance office on July 21, the date of the attack by Poe.  If he had filed it as an emergency grievance, staff would have been required to respond within eight hours.  Instead, Harvey submitted it as a regular grievance.  (Russell Aff. ¶ 8, Dkt. No. 100-3, & Encl. A.)

The grievance alleged that another inmate, "Offender Hubert," (who was later identified as Offender Hubbard) had threatened Harvey.  According to Harvey's grievance, Hubbard told him on Tuesday, July 18 that if he (Hubbard) got moved out of the M/N building, "me and my boys are going to jump you and F you up!!!"  (Dkt. No. 100-3, at 5; Dkt. No. 359-1, at 17 (more legible copy).)  After this threat, Harvey waited two days before he submitted his grievance.  In it, Harvey did not ask for protective custody or to be moved to segregation, nor did he ask for an investigation. Instead, he simply stated that he wanted Hubbard charged with making threats against an offender "with the intent to do bodily harm."  (Dkt. No. 100-3 at 5.)

The grievance nowhere referenced Poe, but it referenced Hubbard's "boys."  (Russell Aff. ¶ 8 & Encl. A; *see also* Clifton Aff. ¶ 4, Dkt. No. 100-1 (explaining that his investigation of the incident revealed that "Harvey never complained to staff at [ACC] that he feared offender Poe or that he had any problem with Poe.").  As Harvey has explained, he had never met Poe before Poe

---

[3]  The operative complaint against these defendants is the amended complaint. (Dkt. No. 196.)

attacked him, and he did not know who Poe was.

Defendant Conner, ACC's Regional Ombudsman at the time, received Harvey's grievance on July 21, 2017, and responded on that date by stating, "[a] copy of your grievance has been forwarded to security + the investigat[ors] office.  This is not the proper procedure for filing a grievance."  (Russell Aff. ¶ 7 & Encl. A.)  Based on her response, then, Conner forwarded the grievance to security for an investigation.  Although Harvey suggests that Russell received Harvey's grievance at 7:00 a.m. (Opp'n 11), he does not cite to any record evidence to support that assertion.  In any event, based on all the evidence, it appears that both the grievance office and the security office received it prior to the 1:00 p.m. attack.

By the time the grievance was received in the grievance office, Hubbard already had been moved from the M/N building.  Moreover, after the grievance was given to security, but before they had the opportunity to interview Harvey, the assault with Poe occurred.  (Russell Aff. ¶ 9.)

The July 21 attack occurred after lunch, at around 1:00 p.m., in the M/N building where Harvey was housed.  The M/N building housed approximately 600 of the 1300 offenders incarcerated at ACC at the time.  Poe was not housed in the building, and he was not authorized to be in it on the date of the attack.  (Russell Aff. ¶ 5.)  But he apparently followed Harvey back from the cafeteria and gained entrance to the M/N building during a period of what is called "mass movement."  "During mass movement, all offenders are observed by corrections officers and are shaken down as they enter the building."  (Russell Aff. ¶¶ 4–5.)

Defendant Burch was the officer observing offenders entering the M/N building on that day.  Burch explained that VDOC policies required him to pat down each inmate for suspicious objects, such as weapons or other objects that inmates are not authorized to possess.  (Burch Aff. ¶ 10.)  Burch has no recollection of patting down Poe on July 21, 2017, but a video from the entryway at the relevant time reflects that Burch patted down Poe as he entered the M/N building.  Despite the

pat-down, Burch did not discover the weapons Poe apparently had on his person.[4]  Poe then

followed Harvey up a set of stairs and attacked him at the top of the stairs.  Poe used a padlock and

razor blades—ten of them, according to Harvey—during the attack.

The moments preceding the attack, much of the attack itself, and the moments afterward are

reflected in two videos that are part of the record.  The first video is taken from a camera that shows

the entryway to M/N Building, where defendant Burch was stationed and conducted a pat down of

Harvey and Poe (as well as other offenders) when they entered the building.  This video also

reflects Burch running upstairs after the attack had begun and some of the events that occurred

afterward, such as Poe coming back down and leaving the building, and Harvey being brought back

downstairs and taken to the medical infirmary.  (*See generally* DVD, Dkt. No. 58.)  The second

video shows the third floor landing, where the attack occurred, and the stairs leading up to that

landing.  The video contains much of the attack (although for portions of it, Poe and/or Harvey are

not entirely visible in the video) and also reflects Burch coming up the stairs as Poe passed him and

shows interactions with Harvey immediately afterward.

## B.  Harvey's Medical Care After the July 21, 2017 Attack

Details about Harvey's medical care after the July 21 attack have been discussed in prior

opinions by the court, in which the court granted summary judgment in favor of a number of

plaintiff's medical providers, including both ACC medical and dental providers and outside medical

providers.  (*See, e.g.*, Dkt. Nos. 138, 289, 291, 366.)  The court summarizes the most salient points

here.

On the day of the attack, Harvey was transported to the Augusta Medical Emergency

Department ("ER"), where a CT scan was performed and where he received stitches on his forehead

---

[4] Harvey alleges that Burch's pat down of Poe was not performed properly.  This allegation was addressed in detail in the court's opinion addressing Burch's motion for summary judgment.

and right eye.  The radiologist's impression from the CT scan indicated: "1. . . . minimally depressed fracture of the inferior aspect of the anterior wall of the right maxillary sinus. 2. Preorbital soft tissue swelling. No intraorbital abnormality. 3. Fractures of the nasal bones and possible fracture of the nasal septum; 4. Fluid in the right sphenoid sinus, concerning for fracture of its wall." (Med. Rec. 26, Dkt. No. 171-1.)  Harvey was not admitted to the hospital, but he was instead returned to ACC.

Although Harvey states that Dr. Rylak, the ER physician, told him that he needed immediate surgeries, neither the discharge instructions nor any other documentation from Dr. Rylak indicated that Harvey needed any immediate surgery.  Instead, those instructions directed Harvey/ACC to call on Monday, July 24, 2017, to obtain appointments with University of Virginia neurosurgery and an ENT physician.  Upon return to ACC's medical unit, he was prescribed a painkiller and antibiotic and kept under observation for 17 days.

Beginning on July 24, 2017, medical personal at ACC took steps to obtain an outside appointment for Harvey, but the appointment was not made until July 31.  He was then seen by an outside specialist, Dr. Park, on August 14, 2017.  Dr. Park stated that Harvey's septum was "deviated to the right and his nasal bones are straight but slightly flattened." (Med. Rec. 20.)  At that time, Dr. Park opined that surgery was not appropriate because (at least in part) the passage of time had caused Harvey's bones to "set" and they could not "be reduced" without breaking them again.  Thus, any surgery at that point would be considered "cosmetic." (*Id.*)  Dr. Park advised that Harvey should "avoid nasal trauma for another 3 weeks and that if his right sided nasal obstruction becomes more severe to follow up with the prison physician." (*Id.*)  Where the form asked for "treatment and medications recommended," Dr. Park wrote, "No intervention necessary." (Med. Rec. 18.)  Dr. Landauer, an ACC physician, reviewed Dr. Park's report and concluded, based on her "education, training, and experience," that additional outside consultations for Harvey's injuries

were unnecessary.  (Landauer Aff. ¶ 19.)  Harvey continued to ask to be seen by an outside specialist for surgery for his nose, but his requests were denied.  Harvey contends that the delays in his treatment have caused him to suffer permanent deformity of his nose and caused him to lose the ability to breathe out of the right side of his nose.[5]  He also contends that he suffered dental injuries from the July 2017 attack and that his nose was injured again during the October 2017 attack.  He alleges that defendants were deliberately indifferent to those injuries, as well.[6]

In particular, Harvey alleges that defendants were aware, based on observing him while in the medical department, or based on his subsequent grievances, that he required surgeries and additional treatment.  Effectively, Harvey seeks to hold these defendants responsible for the initial delay in treatment, as well as for the continued failure to refer him to an outside physician after he saw Dr. Park in mid-August 2017, or for outside dental treatment, through the time of his transfer to Greensville in February 2018.

## C.  The October 24, 2017 Attack

On October 24, 2017, Harvey alleges that he was attacked by his cellmate, Offender Monroe and that defendant Lewis ignored his pleas for help.  Defendant Lewis is a correctional officer who was working the control booth in Harvey's pod on that date.  At the time, the pod was locked down, which meant that offenders could not leave their cells.

Lewis avers that, during his shift and after the lockdown, he heard an offender yell and looked out of the control booth to see an offender waving his arm out the cell window.  "It is not

---

[5]  Harvey was transferred to Greensville Correctional Center in February 2018.  He continued to receive medical care for his deviated septum, and, after a subsequent visit to an outside medical provider, he was recommended for nose correction surgery, which occurred on March 1, 2019, approximately twenty months after the July 2017 assault.

[6]  Harvey focuses primarily on the lack of outside medical care for his broken nose and deviated septum, but he also contends that defendants improperly denied him dental care.  As discussed by the court in its memorandum opinion addressing defendant Coyner's motion for summary judgment, Harvey first complained about tooth pain on a front top tooth on August 7, 2017, and he was seen by a dentist at ACC three days later.  The moving defendants here are entitled to summary judgment as to any claim of deliberate indifference to Harvey's dental needs for the same reasons as they are as to his medical claims.

unusual to see this during a lockdown.  Oftentimes an offender does this if he wants to get some ice, has left something in the microwave, or left something on the pod."  (Lewis Aff. ¶¶ 5–6, Dkt. No. 339-8.)  Lewis took no action in response to seeing this and instead returned to his duties.  (*Id.* ¶ 6.)  "A few minutes later," he again heard yelling and when he looked toward the same cell, he saw an offender waving an object that appeared to be a towel or a t-shirt, (*id.* ¶ 7), which appeared to have blood on it.[7]  Because "[t]his seemed unusual," Lewis called his Sergeant to report it, and additional staff responded to investigate.  Lewis was not permitted to leave the control booth, so he did not.

Lewis further avers that he did not know at any time what Harvey wanted nor could he understand what Harvey was yelling about.  He testifies that if he had "reason to believe that Offender Harvey was being harmed, [he] would have called for assistance immediately."  (*Id.* ¶ 11.)

The report identifies the time of the incident as 9:25 p.m. and describes it as a "simple assault."  The description states:

> On 24th October, 2017 at approximately 9:25 pm Officer T. Lewis called Sgt. Kinsale via radio and asked him to call D1/2 Control Room, when he did, Officer Lewis said he had an Offender in D2-16 shouting and waving a T-shirt or a towel out his cell door with what appears to be blood on it.  When Sgt. Kinsale got to D2-16 cell door Harvey . . . was standing there with a T-shirt with blood on it and a cut across his nose.  Offender Harvey was asked what happened and he stated that his cell mate Offender Monroe . . . punched and hit him on his face with his boots and he needed to get out [of] the cell before he attack[ed] him again.  Sgt. Kinsale notified Unit #12, Lt. Rosson about the situation and that Offender Harvey was being escorted to Medical.  Base[d] on the injury and the statement made it was determined that Officer Harvey had been struck in the face. . . .

(Lokey Aff. & Encl. A, Dkt. No. 339-10.)  Monroe was charged with simple assault.  (*Id.*)

Defendants have submitted videos showing various angles of the D2 pod and its

---

[7] Harvey accuses Lewis of attempting to mislead the court because Lewis's summary judgment affidavit does not mention that he saw blood on the t-shirt or towel.  But the incident report reflects that Lewis reported seeing blood. (Dkt. No. 339-10, at 3.)  Moreover, Lewis admitted in his answer to Harvey's amended complaint that "on October 24, 2017, he saw Harvey [waving] what appeared to be a t-shirt or towel with what appeared to be blood on it from Harvey's cell."  (Answer 5, Dkt. No. 243.)

entranceway on that date.  (DVD, Dkt. No. 58.)  Defendants provided an affidavit with the videos stating that there never was any video of Harvey's cell, however, because there was not a camera pointing in the direction of Harvey's cell at the specified time.[8]  Thus, neither the interior nor the exterior portion of Harvey's cell is visible in any of the videos.

In addition to claiming that defendants were deliberately indifferent for failing to protect him from both attacks, Harvey also names the Director of VDOC, Harold Clarke, as a defendant, pointing to several VDOC policies or customs that he says allowed or contributed to both attacks. These include the custom of allowing "mass movement" of prisoners at ACC, Clarke's alleged failure to properly supervise staff, his alleged failure to properly train staff as to pat down procedures, his alleged failure to ensure proper staffing on October 24, and his alleged failure to install sufficient video cameras so that no blind spots would exist.

## II.  SUMMARY JUDGMENT STANDARD

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[9]  A genuine issue of material fact exists only where the record, taken as a whole, could lead to a reasonable jury to return a verdict in favor of the nonmoving party.  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).  In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

---

[8]  According to the affidavit, the pod has four cameras, all without audio: three are fixed and point at the front door, back door, and the stairs.  The fourth is a PTZ camera that can be moved and pointed in different directions.  The PTZ camera was pointed at the front door and out into the pod, but it did not capture the area of Harvey's cell on that date.  (*See generally* Lokey Aff., Dkt. No. 54-1.)  The videos reflect, though, that an officer enters the pod at approximately 9:28 p.m., three minutes after Lewis first alerted a supervisor, and that officer goes to an area offscreen, presumably to Harvey's cell.

[9]  The court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted.  *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Id.* at 247–48.  Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990).

## III.  DISCUSSION

**A.  Claim Six:  Failure-to-protect claim against defendants Whitlock, Russell, and Woodson**

In Claim Six, Harvey alleges that Whitlock, Russell, and Woodson violated his Eighth Amendment rights in failing to protect him from the attack by Poe.  To hold a prison official liable under § 1983 for a failure to protect, a plaintiff must establish that: (1) he was "incarcerated under conditions posing a substantial risk of serious harm" and (2) the defendant prison official had a "sufficiently culpable state of mind," one of "deliberate indifference."  *Farmer*, 511 U.S. at 834.  In order to succeed on a failure-to-protect claim, a plaintiff must show that the harm suffered was objectively serious, *i.e.*, he must show he suffered a "serious or significant physical or emotional injury."  *Danser v. Stansberry*, 772 F.3d 340, 346 (4th Cir. 2014).

Harvey suffered serious injury, so the objective element is not at issue here.  Instead, defendants contend that Harvey has failed to set forth allegations showing "deliberate indifference" on the part of any of these three defendants.

Deliberate indifference is "something more than mere negligence," but can be "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  *Farmer*, 511 U.S. at 834–35.  A prison official acts with deliberate indifference if he has "actual knowledge that an inmate faces substantial risk of serious harm and disregards the risk by

10

failing to take reasonable measures to abate it." *Id.* at 835. The test is not "whether an official knew or should have known of the possibility of harm, but whether he did, in fact, know of it and consciously disregard[ed] that risk." *Id.* The official must be aware of facts which "the inference could be drawn that a substantial risk of serious harm exists" and he must also "draw the inference." *Id.* at 837.

An inmate may prove deliberate indifference through direct or circumstantial evidence, and "[d]irect evidence of actual knowledge is not required." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). The plaintiff may satisfy the deliberate indifference element with evidence that the challenged circumstances created a "substantial risk" of harm that "was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Id.* Even without direct evidence, "an injury might be so obvious that the factfinder could conclude that the [official] did know of it because he could not have failed to know of it." *Id.*

Harvey alleges that these three defendants should be liable for failing to protect him both because: (1) Poe was a known violent gang member; and (2) before the attack, Harvey filed a grievance complaining of verbal threats of serious bodily harm.[10]

Poe's status as a violent gang member is insufficient to confer knowledge of a substantial risk to Harvey. *See Fuller v. Cty. of Charleston*, 444 F. Supp. 2d 494, 498 (D.S.C. 2006) (explaining that "[a]bsent some evidence that prison officials were subjectively aware that this inmate was likely to attack Plaintiff, the mere fact that the attacking inmate was classified as

---

[10] Harvey alleges in his verified opposition that he is "openly gay and effeminate" and thus at "special risk" of assault. (Opp'n 13.) *See Randolph v. Maryland*, 74 F. Supp. 2d 537, 542 (D. Md. 1999). It is unclear whether these factors played any role in the assault by Poe or Monroe, and there is no evidence in the record as to whether any of the defendants knew that Harvey possessed these particular traits. Harvey does not discuss them at all, except to mention them in passing.

potentially violent cannot constitute deliberate indifference").  Thus, Harvey cannot establish that they were deliberately indifferent based on Poe's gang status.

Harvey also alleges that these defendants were given Harvey's grievance complaining of the threat from Hubert (who was actually Hubbard) "and [his] boys," and they thus had actual knowledge of a serious, direct threat against him.  None of the defendants testify as to whether they did—or did not—have knowledge of Harvey's grievance before the attack by Poe.  They merely focus on the fact that Poe was not named in the grievance and that Harvey had never complained of any threat by Poe himself, which Harvey concedes.  Harvey, notes, however, that he did not know Poe before the attack, nor did he know that Poe was one of Hubbard's "boys."  Thus, he could not have identified him by name.

In determining whether these three defendants were deliberately indifferent, the court first notes that there is no competent evidence to show that Whitlock or Woodson had knowledge of Harvey's grievance and complaint before he was attacked by Poe.  Harvey states summarily that they were present at ACC that day and that Whitlock works in the ACC security office.  (Opp'n at 4.)  From these facts alone, he imputes knowledge of his grievance to both.  (*Id.*)  But their mere presence at ACC is insufficient.  There is nothing in the record to show that either had actual knowledge of his grievance before the attack.  Thus, there is no evidence that Whitlock or Woodson knew of a likely attack on Harvey (either by Poe specifically or by any of Hubbard's "boys") prior to the attack actually occurring.  As such, Harvey cannot succeed as against either of them, and they are entitled to summary judgment as to this claim.

Russell stands on different footing.  There is some evidence before the court that Russell had received notice of Harvey's grievance before the 1:00 p.m. attack, but security had not yet "had the opportunity to interview Harvey."  (Russell Aff. ¶¶ 8–9.)  According to defendant Conner's response to Harvey's interrogatories, Conner forwarded a copy of the grievance to Russell before

Harvey was assaulted, and Russell was in the ACC security office at the time.  (Opp'n 10 (citing Conner's Resp. to Int. No. 22); *see also* Dkt. No. 359-1 at 18, Conner's Resp. to Ints.)

Harvey avers that, upon his receipt of the grievance, Russell should have immediately placed Harvey in protective custody until Hubbard's "boys" could be properly identified and no threat remained.  Because Russell failed to do so, Harvey seeks to hold him liable for a failure to protect.

The court's analysis of Russell's actions and the reasonableness of his response to the grievance is complicated by the lack of information in his affidavit and in the record generally.  For example, Russell suggests that "Security" received Harvey's grievance before the attack by Poe, but nowhere does he identify when or even admit that it was he who received it.  He also provides no information about when, relative to the attack, he became aware of the threat against Harvey, nor does he explain what steps he (or other members of the security team) took, if any, in response to that knowledge.  For example, although he says security had not yet interviewed Harvey at the time of the attack, he does not say what, if anything, had been done to investigate or to protect Harvey.  Nor does he attempt to explain why it was proper to not move more quickly in response to his knowledge of that threat.  This information, however, is critical.

Suppose Russell first saw the grievance at noon and started investigating at that point, figuring out who "Hubert" actually was, for example, but the attack happened at 1:00 p.m., before he could take further action.  If those were the facts, the court might be able to say as a matter of law that he responded reasonably, and, thus, there was no deliberate indifference.  Likewise, if Russell received it three hours ahead of time, and he and the rest of the security team spent all their time before the attack investigating a more urgent matter, the result might be similar.

But construing facts in Harvey's favor, and in the absence of any information about when Russell learned of Harvey's grievance and anything he did in response, it is possible that Russell

knew about the grievance for some period of hours and did nothing. A reasonable jury could find that doing nothing in response to this type of threat, particularly for a longer period of hours (as opposed to a shorter period of time) was not reasonable, but was instead deliberately indifferent to Harvey's risk of being attacked. Accordingly, the court will deny summary judgment as to the failure to protect claim against Russell, related to the July 21, 2017 attack.[11]

**B. Claim Twelve: Failure-to-protect claim against defendant Lewis**

In Claim Twelve, Harvey contends that Lewis violated his Eighth Amendment rights when he failed to intervene sooner in the ongoing attack by Harvey's cellmate, Monroe. Harvey says that he was yelling about the attack and waving an object out the cell window, but that Lewis delayed responding, instead allowing the attack to continue and to escalate to rape.

Harvey's arguments about his claim against Lewis are somewhat confusing. For example, the court does not understand Harvey's allegation that Lewis or other staff waited "twenty-six minutes" to respond. (Dkt. No. 359 at 41.) One of the videos of that evening reflects that the two officers left the pod at 9:09 p.m. Lewis testified that after the pod was locked down (but did not say how long after the pod was locked down), he heard yelling and saw an offender (subsequently identified as Harvey) waving his hand out the cell door. In his opposition, Harvey misquotes

---

[11] Although Conner, too, had knowledge of the grievance prior to the July 21 attack, Harvey's failure-to-protect claim against her (Claim Fourteen) was previously dismissed by the court. (*See* 07/07/20 Mem. Op. at 14, Dkt. No. 313.) The court now has additional information about Conner's actions, but that information does not call into question the court's prior ruling. Assuming the grievance gave sufficient notice of a likely attack, Conner was required to take "reasonable measures to guarantee" Harvey's safety in order to avoid liability under the Eighth Amendment. *See Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984). In response to Harvey's grievance, she notified him that he had not used the proper procedure for reporting such a threat, but she nonetheless forwarded a copy of his grievance to "security + the investigat[ors] office." (Russell Aff. ¶ 7 & Encl. A.) As the court did in its prior opinion, the court concludes that this was a reasonable response to the grievance which was not even submitted as an emergency grievance.

The court further notes that Harvey alleges that, two weeks before the July 21 attack, he spoke to two other individuals—Unit Manager T. Back and Counselor Terry Butler—about "the multiple issues and problems" he had with Offender Hubbard. (Harvey Opp'n Aff. 11, Dkt. No. 359-1.) The grievance he submitted, too, states that he told Back and Butler about the threats. Harvey did not name Back or Butler as defendants, however, and he admits that Back had moved Hubbard from the M/N unit in response to Harvey's earlier complaints. Harvey does not allege that either of those individuals ever passed on to any of the defendants any of the information that he had shared with them. Thus, whether or not Back or Butler had knowledge of any threats has no bearing on the liability of the named defendants.

Lewis's affidavit to make it seem as if he stated that he first heard yelling "shortly" after lockdown began, which is not what the affidavit says.  From this improperly altered quotation, and because Lewis did not call for assistance until 9:25, Harvey claims that Lewis "ignored" Harvey's pleas from at least 9:09 (when the two officers stopped their rounds after locking the pod down) until 9:25.

Nothing supports that argument, however.  The record does not show when Lewis first saw Harvey's hand waving out the cell, but Lewis insists that he could not hear what Harvey was saying and that he did not find it unusual to see a hand waving out a cell door, nor did he believe it meant anyone was in danger or being assaulted.  Harvey presents no evidence to contradict this testimony.  Lewis then says that a few minutes after that, he looked again and saw the bloody t-shirt or towel being waved.  At that point, he believed there might be a problem, and he notified supervising staff immediately.  According to the undisputed incident report, moreover, Lewis called his supervisor at 9:25, and the videos of the area reflect an officer reporting to the pod three minutes later.  Harvey does not offer any competent evidence to dispute this timeline.[12]

On these facts, no reasonable jury could conclude that Lewis was deliberately indifferent to a known risk of harm to Harvey.  As soon as Lewis suspected that an offender may be in danger, he reported it to his supervisor, and another officer responded within three minutes.  His conduct did not violate Harvey's Eighth Amendment rights, and the court will grant summary judgment in Lewis's favor.

---

[12] In his opposition, Harvey repeatedly states that Lewis has "previously admitted" that he "failed to respond to Harvey's pleas for help in a timely manner."  (Opp'n 20, 40.)  He cites to Dkt. No. 101, which is Lewis's answer, but he then references—and appears to quote from—the statement of facts in defendants' first motion for summary judgment, Dkt. No. 100.  That "fact," in turn, was taken directly from plaintiff's original complaint, and the summary judgment motion even cites to plaintiff's complaint as the basis for the fact that Lewis "failed to respond to Harvey's pleas for help in a timely manner."  (Dkt. No. 100 at 4 (citing ECF No. 1, ¶ 18).)  A defendant, however, does not make an "admission" when he accepts as true, for purposes of a summary judgment motion, something pled in the complaint.  Moreover, defendants' motion sought summary judgment in Lewis's favor solely on the ground that Harvey failed to state a failure to protect claim by failing to include detail in support of his allegation.  Thus, Harvey is incorrect that this fact has been "admitted."

### C.  Claims Three & Four:  Medical Claims Against Whitlock, McDaniel, Peale, Woodson, Russell, and Conner

In these two claims, Harvey alleges that the listed defendants violated his Eighth Amendment rights by failing to refer him for medical treatment outside ACC.  All of these defendants are non-medical personnel, and all aver in their affidavits that they relied on the medical judgments of Harvey's medical providers as to what treatment he required.  (*See generally* Affidavits of Whitlock, McDaniel, Peale, Woodson, Russell, and Conner, Dkt. Nos. 339-1 through 339-6.)  All also testify in their affidavits that they were not personally involved in the medical treatment that Harvey either received or did not receive, that they did not interfere with Harvey's treatment, and that they were not aware that any medical professional was somehow mistreating Harvey.  (*Id.*)  They also have all stated that they had no ability to override Dr. Landauer's decision or request additional care for Harvey.  (*Id.*)

A non-medical provider generally cannot be held liable for a failure to provide an inmate medical treatment where, as here, that inmate is under the care of a physician for the ailment or injury.  *Miltier v. Beorn,* 896 F.2d 848, 854 (4th Cir. 1990) (holding that non-medical personnel are entitled to rely on the professional judgment of medical practitioners to determine appropriate treatment for a patient); *see also Iko v. Shreve*, 535 F.3d 225, 242 (4th Cir. 2008) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) (holding "[i]f a prisoner is under the care of medical experts . . . , a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands.'").  Instead, in order to hold a non-medical provider liable in such circumstances, the plaintiff must show that the defendant was personally involved with a denial of treatment, deliberately interfered with a doctor's treatment, or tacitly authorized or was indifferent to the prison physician's misconduct.  *Miltier*, 896 F.2d at 854; *see also Cannon v. Armor Corr. Health Servs.*, No. 1:18cv202, 2019 WL 164391, at *7 (E.D. Va. Apr. 15, 2019) (noting same); *James v. Va. Dep't of Corr.*, No. 7:16cv442, 2018 WL 1528217, at *7 (W.D. Va. Mar. 28, 2018).

16

Harvey seems to rely on the third of these showings.  For each defendant, Harvey insists that they can be held liable for following the advice of Dr. Landauer, which he contends was simply wrong.  He contends that it was obvious even to a layperson that he was in need of hospitalization or other care, and points to his untreated "deviated septum to the right with flattened nasal bones." (*See, e.g.*, Opp'n 4, 5, 6, 8, 9, 12, 13, 14, 15, 18.)  Effectively, he claims that Dr. Landauer was deliberately indifferent to his medical needs and was so wrong in her assessment of his needed treatment that these other non-medical defendants should have known that he required outside treatment.

The court cannot agree with Harvey's reasoning.  First of all, the court already has ruled that Dr. Landauer was not deliberately indifferent to Harvey's medical needs.  Harvey repeatedly relies on his diagnosis—that he had a deviated septum and flattened nose—but he has not offered any facts that would allow a reasonable jury to find that any of these defendants knew he was receiving inadequate treatment or had reason to believe that he was being mistreated.

Harvey's injuries from the July 21 attack were not insignificant, but medical personnel at ACC requested permission for him to have a return appointment to an outside specialist, as the ER physician had recommended, and he had that outside appointment on August 14.  Both that outside physician, Dr. Park, and Dr. Landauer, after reviewing Dr. Park's report, had concluded that Harvey did not need further treatment at that time.  Given that assessment by multiple physicians, no reasonable jury could find that his injuries were so obvious to laypeople that these non-medical defendants should have taken unauthorized steps to override Dr. Landauer's treatment decisions.[13] Accordingly, all of these defendants are entitled to summary judgment on Harvey's Eighth

---

[13]  The court further notes that, by some estimates, "[a]bout 70 to 80 percent of people have a septal deviation that's noticeable to an examiner.  In many people, the condition doesn't cause symptoms, or symptoms are minor and no treatment is required."  John Pallanch, M.D. Otorhinolaryngology, Mayo Clinic (answering question posed in newsletter), available at https://newsnetwork.mayoclinic.org/discussion/if-symptoms-arent-bothersome-deviated-septum-usually-doesnt-require-treatment/ (last visited August 20, 2021).

Amendment claims against them.

As to defendants McDaniel and Peale, Harvey makes the additional argument that they can be held liable under the Eighth Amendment because they, in fact, interfered with his treatment. Specifically, he alleges that, while he was in the medical department after the July 2017 attack, McDaniel and Peale repeatedly threw away his medical grievances and complaints, which he was submitting to request additional medical care.  He offers little in the way of detail about this or about what the grievances and complaints actually said.

Importantly, though, it is undisputed that during this time Harvey was under the direct care of personnel in the medical department and being housed there for observation.  Records reflect that he received medicine multiple times per day and had contact with multiple medical providers each day.  Even if McDaniel and Peale threw away his grievances, Harvey presents no reason why he could not have asked any number of medical staff who were observing and/or treating him, for whatever additional treatment he believed was warranted.  In short, he cannot show that their actions—even if they could be construed as deliberately indifferent to his needs—actually resulted in some harm to him, when he had other avenues available to him for asking for treatment or relief and those avenues were more direct, *i.e.*, requests could be made directly to the medical providers that were observing and interacting with him.

Notably, both the medical records and grievance records reflect that Harvey made requests of medical staff during this time to be seen by an outside physician.  (Dkt. No. 359-1, at 30 (noting request made on July 24, 2017); Dkt. No. 1-1 at 6 (July 26, 2017 informal complaint requesting to be seen by an outside provider for operations, with response provided 8/3/2017).)  Thus, his medical providers knew of his requests to see an outside physician.  As noted, moreover, he had an outside appointment with Dr. Park on August 14, 2017, which was about 3.5 weeks after his initial injuries.

For all of these reasons, the court will grant defendants' motion for summary judgment as to

Claims Three and Four against defendants Whitlock, Russell, Woodson, McDaniel, Peale, and Conner.

**D. Claim Five: Claim Against Whitlock Based on Denial of Bibles**

In Claim Five, Harvey alleges that defendant Whitlock violated his First Amendment rights by taking and refusing to return his three Bibles. This occurred while he was being housed in the medical department, for the period from July 21 through July 25—when he was in administrative segregation within the medical department—and thereafter until August 7, when his Bibles were returned to him. Whitlock contends that she is entitled to summary judgment on this claim for at least two reasons. First, she contends that Harvey has not shown that any conduct by her was intentional. Second, she argues that Harvey may not recover any damages under the PLRA for this First Amendment claim because he did not suffer a physical injury. The court concludes that the first of these reasons is sufficient to grant her summary judgment, and it thus does not rely on the second.[14]

To state a First Amendment violation, Harvey must demonstrate that defendant's actions substantially burdened his exercise of his religion. *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989). As explained by the Fourth Circuit,

> a substantial burden is one that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, or one that forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and

---

[14] Whitlock's second basis for summary judgment notes that the Prison Litigation Reform Act does not permit the recovery of damages for emotional distress or harm absent a physical injury. 42 U.S.C. § 1997e(e). Because Harvey did not suffer any physical injury as a result of being deprived of his Bibles for several weeks, her argument continues, he is not entitled to damages for emotional harm or injury. *See id.* For support, Whitlock cites to a number of district court decisions within this circuit. In 2017, however, the Fourth Circuit explained that a prisoner plaintiff who experiences no physical injury may nonetheless be entitled to compensatory damages for the "injury to [his] protected first amendment interest." *See Wilcox v. Brown*, 877 F.3d 161, 169–70 (4th Cir. 2017); *see also Piver v. Pender Cty. Bd. of Educ.*, 835 F.2d 1076, 1083 (4th Cir. 1987) (discussing that substantial damages (as opposed to nominal damages) "may be presumed in cases where the actual proof of damages would be difficult or impossible" and specifically noting that "an injury to a protected first amendment interest can itself constitute compensable injury wholly apart from any 'emotional distress, humiliation and personal indignity, emotional pain, embarrassment, fear, anxiety and anguish' suffered by plaintiffs") (citations omitted). In light of this authority, the court does not rely on Whitlock's second argument, in whole or in part, in granting her motion for summary judgment.

abandoning one of the precepts of her religion on the other hand.

*Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006).

Here, it appears undisputed that Harvey was deprived of his Bible for a period of weeks while he was housed in the medical department.  Whitlock has no recollection of this occurring, but she does not dispute it.  (*See generally* Whitlock Aff., Dkt. No. 339-1.)  Harvey avers that daily reading of his Bible is required by his religion.  (Opp'n 4 ("The daily reading of my Bible is the most important precept of my religion.").)  The Fourth Circuit has held, albeit in an unpublished decision, that depriving a prisoner of access to his Bible for a period longer than 24 hours, when his religion required him to read and study the Bible daily, substantially burdened his exercise of his religion.  *Blankenship v. Setzer*, 681 F. App'x 274, 276–77 (4th Cir. 2017).  Thus, the deprivation of Harvey's Bibles from July 21 through August 7 substantially burdened Harvey's ability to exercise his religion.

In *Blankenship*, that deprivation was based on a prison policy that prohibited prisoners transported for county court proceedings from taking Bibles with them.  Here, by contrast, Harvey alleges that it was a violation of prison policy to not allow him to have his Bible.  Instead of challenging a policy, therefore, he is challenging an individual defendant's failure to follow the policy.[15]

As noted, Whitlock does not recall whether or not Harvey was given his Bibles while he was in the medical unit.  She admits, though, that when an offender is housed in the medical department at Augusta, he usually is permitted to have his property with him, "so long as there are no concerns about contraband or other security or safety issues."  (Whitlock Aff. ¶¶ 9–10.)  In short, then, she

---

[15]  Where a policy or practice substantially burdens a sincerely held religious belief, then that policy or practice can withstand a First Amendment challenge so long as it is "reasonably related to a legitimate penological interest."  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).  This inquiry is governed by the four so-called *Turner* factors.  *Lovelace*, 472 F.3d at 200 (setting forth the four factors).  Here, no policy is being challenged.  Harvey alleges that Whitlock deprived him of access to his Bibles, which he says violated policy.

does not dispute that Harvey improperly was denied access to his Bibles (but has no memory of that transpiring), but she avers that any deprivation was inadvertent, rather than intentional.  Indeed, she expressly states: "Even if Harvey's property was restricted for some reason while he was housed in the medical department at Augusta, it was never my intent to restrict or interfere with his ability to practice his religious beliefs or read his Bible."  (*Id.* ¶ 11.)

Importantly, to hold an individual liable under the First Amendment, the plaintiff must allege that the defendant "acted with the requisite intent."  *Lovelace*, 472 F.3d at 194.  Specifically, a plaintiff must show that the defendant engaged in "intentional conduct."  *Id.*; *Washington v. McAuliffe*, No. 7:16cv476, 2018 WL 401903, at *4 (W.D. Va. Jan. 12, 2018).  As the Fourth Circuit described it, to prove a First Amendment violation requires showing a defendant's "conscious or intentional interference" with the plaintiff's religious rights.  *Wall v. Wade*, 741 F.3d 492, 500 n.11 (4th Cir. 2014) (quoting *Lovelace*, 472 F.3d at 194–95, 201–02); *see also Halter v. Hutcheson*, No. 7:20cv00219, 2021 WL 1186883, at *4 & n.6 (W.D. Va. Mar. 30, 2021) (granting summary judgment against plaintiff's First Amendment claim, in part because plaintiff had failed to present evidence of intentional conduct by the individual defendants).  This is a standard that Harvey cannot meet here.

As noted, Whitlock denies that she intentionally deprived Harvey of access to his Bibles to interfere with his religion.  In attempting to counter her testimony regarding her intentions, the only evidence to which Harvey points is the fact that he filed an informal complaint, dated August 2, 2017, concerning the Bibles, to which Whitlock responded.  (Dkt. No. 1-1, at 30.)  In the informal complaint, Harvey complained about a number of items he alleges he was denied while in segregation and included an assertion that three of his Bibles had been taken and not yet returned.  (*Id.*)  That document was received on August 3, 2017, and Lt. Whitlock responded on August 5, 2017.  (*Id.*)  Although her response does not specifically mention the Bibles, it states that "Officer

Ryder provided the items you requested." (*Id.*)  Dissatisfied with her response generally, Harvey

filed a regular grievance thereafter, but that document was signed by him on August 8, after he now

says he received his Bibles back.  (Dkt. No. 1-1, at 32.)

At most, then, the record reflect that at some point on August 3, 2017, Lt. Whitlock was

made aware of Harvey's allegations concerning the Bibles.  She apparently investigated and

responded to his informal complaint two days later.  Two days after that, he received his Bibles

back, a total of four days after Whitlock learned of his allegations.  Moreover, she denies that the

Bibles were taken with any purpose of interfering with Harvey's exercise of his religion, which she

had no intent to do.

Faced with similar types of conduct by prison officials, courts have held that a plaintiff

failed to state a First Amendment violation.  In *Shidler v. Moore*, 409 F. Supp. 2d 1060, 1068–69

(N.D. Ind. 2006), for example, the prisoner was deprived of communal worship for 39 days because

his religion was entered incorrectly in his records and it took a long time to follow the procedure for

getting it changed.  The court noted that no one prohibited plaintiff from changing his designated

religion, prevented him from doing so, or refused to change his record.  Thus, at most defendants

were negligent, which did not state a First Amendment violation.  *Id.*; *see also Colvin v. Caruso*,

605 F.3d 282, 291 (6th Cir. 2010) (concluding that defendant chaplain was entitled to qualified

immunity as to First Amendment claim against him because there was insufficient evidence that he

"knowingly" violated the plaintiff's rights—he committed a "reasonable mistake" and once the

mistake was discovered, he acted "as quickly as possible" to ensure that the plaintiff received his

religious meals).

Likewise, here it appears that Harvey was mistakenly deprived of his Bibles, as well as other

materials, while he was in administrative segregation and that, thereafter, his property was not

timely returned to him.  Notably, the Bibles were not the only personal property he mistakenly was

not permitted to have, which undercuts any argument that his religion was being targeted.

Moreover, after Whitlock was made aware, on August 3, 2017, she investigated and responded two

days later, and two days after that, Harvey's Bibles were returned.  Her reasonably prompt

correction of the mistake supports the conclusion that the deprivation was not intentional.

Cases where courts have denied summary judgment on the issue of intentional conduct,

moreover, have had significantly more facts calling into question whether the defendant's conduct

was intentional, rather than merely negligent.  In *Lovelace v. Lee*, 472 F.3d 174 (4th Cir. 2006), for

example, the defendant repeatedly insisted he had not mistaken plaintiff for another inmate when he

reported seeing plaintiff take a lunch tray, which resulted in the plaintiff being denied his Ramadan

tray.  472 F.3d at 195.  Defendant continued to so insist "even when faced with evidence . . . that he

might have erred," he failed to check any number of documents or video that could have confirmed

him to be wrong, he did not admit his mistake until he faced a lawsuit, more than nine months after

the end of Ramadan, and he offered inconsistent reasons for his mistake in two different affidavits.

*Id.*  Based on this significant evidence that defendant's action may have been intentional, the court

concluded there was "enough evidence of culpability" to deny summary judgment.  *Id.*

By contrast, based on the record before it, the court concludes that there is insufficient

evidence from which a reasonable jury could find that Whitlock intentionally interfered with

Harvey's exercise of his religious rights.  Accordingly, summary judgment in her favor on this

claim is appropriate and will be granted.

**E.  Claims Nine, Eleven, and Sixteen: Harvey's Failure to Exhaust**

As to claims Nine (a claim against defendant LaCour, the laundry manager, for failure to

provide a clean, white bed sheet in September 2017), Eleven (a claim that Herrick, the Director of

Health Services, violated Harvey's Eighth Amendment rights by failing to approve his nose

surgery), and Sixteen (a claim that VDOC's director, defendant H. Clarke, created a "state danger"

for Harvey through allowing "mass movement" and via other policies), defendants contend that Harvey failed to exhaust his administrative remedies and thus that those claims are barred.

The court addresses Claims Nine and Eleven on their merits in subsequent sections. As to Claim Sixteen, Harvey argues that he did not file a grievance regarding the "mass movement" policy because it was an unofficial policy or custom and was unknown to him during the entire year of 2017 while he was incarcerated. He claims that the "policy" was not disclosed to him and, moreover, that it is not a policy, but a widespread custom. As a result, he claims that exhaustion was not required. (Opp'n 22–23.)

The court disagrees. The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement "allow[s] a prison to address complaints about the program it administers before being subjected to suit, reduc[es] litigation to the extent complaints are satisfactorily resolved, and improve[es] litigation that does occur by leading to the preparation of a useful record." *Jones v. Bock*, 549 U.S. 199, 219 (2007). "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Id.* at 211.

The PLRA requires "proper exhaustion" of available remedies prior to filing suit. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). "[P]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceeding." *Id.* at 90–91. Thus, an inmate's failure to follow the required procedures of the prison's administrative remedy process, including time limits, or to exhaust all levels of administrative review is not "proper exhaustion" and will bar the claim. *Id.* at 90. Notably, moreover, district courts may not "excuse a failure to

24

exhaust." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016).

A prison official has the burden to prove an inmate's failure to exhaust available administrative remedies. *Jones*, 549 U.S. at 216. Once a defendant presents evidence of a failure to exhaust, the burden of proof shifts to the inmate to show, by a preponderance of the evidence, that exhaustion occurred or administrative remedies were unavailable through no fault of the inmate. *See, e.g., Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011); *Graham v. Gentry*, 413 F. App'x 660, 663 (4th Cir. 2011) (unpublished).

The only reason offered by Harvey is that he did not know of this custom of mass movement.[16] But he was housed at ACC and observed the movement of prisoners on a daily basis throughout his time there. It is simply untenable to argue that he did not "know" about the fact that inmates were allowed to move in large groups at the same time, especially going to and from meals. He certainly could have argued that this custom or policy had contributed to the attack against him. He did not file any similar type of grievance challenging the custom or policy, however. This court may not excuse that failure. *Ross*, 136 S. Ct. at 1856. Because the undisputed evidence reveals that Harvey failed to exhaust any claim against defendant Clarke specifically or any claim challenging the promulgation or enforcement of VDOC custom or policy, the court will grant the motion for summary judgment as to the claims against Clarke.

The court further notes that the evidence before it fails to provide sufficient evidence to hold Clarke responsible for either of Harvey's attacks in any event. In his opposition to the motion for summary judgment, Harvey complains that Clarke failed to reference any of the other portions of Claim Sixteen, including the following alleged failures by Clarke:

---

[16] Harvey also claims that he exhausted this issue, but the grievance to which he points, ACC 17Reg00388, complained about the attack generally and asked for the names of officers who "allows" Poe to assault him. (Dkt. No. 1-1, at 46–49.) In appealing, he emphasized that he was assaulted "because of the extreme negligence" of the officers who allowed Poe to enter the building and attack Harvey. (*Id.* at 49.) His grievance nowhere references the custom or policy of allowing large groups of offenders to enter and exit buildings, nor does it fault any other custom or policy.

- Clarke failed to maintain proper oversight and authority over his subordinates, including Whitlock, Russell, and Woodson, which was a "substantial contributing factor" in allowing [his] second assault and rape to take place.  (Opp'n 24, (citing Claim 16, at 2).)

- Clarke failed to provide adequate levels of staffing and security at ACC on October 24, 2018 (Opp'n 25 (citing Claim 16, at 4)), which contributed to Harvey's attack on that date; and

- Clarke failed to install and update "VDOC" monitoring systems, electronic surveillance systems after his July 21, 2017 assault, so as to eliminate the existence of purported "blind spots," which contributed to the October 24, 2018 attack (Opp'n 25 (citing Claim 16, at 6)).

The court concludes, however, that there is insufficient evidence to conclude that Clarke should be held liable for a violation of Harvey's Eighth Amendment rights.  First of all, aside from Harvey being the victim in both attacks, he does not offer anything tying together the attack by Poe and the attack by his cellmate, Monroe.

Moreover, although the custom of "mass movement" may have contributed to the attack by Poe, Harvey presents no evidence that there were any prior attacks after a period of mass movement, that there were any persistent or widespread problems as a result of the mass movement custom, or that Clarke was aware of any such problems, if they existed.  Likewise, and even assuming the alleged failures by Clarke—such as a lack of supervision, training, adequate staffing, or sufficient cameras—made Harvey's second attack more likely, he has not shown that there were any prior problems or attacks as a result of them.  Thus, he has failed to show that Clarke personally had knowledge that Harvey or anyone else was at risk of an attack from this custom (or any of the other policies or "failures" in security, identified by Harvey.)  His claims against Clarke fail on this basis, as well.[17]

---

[17] For like reasons, any *Monell*-type claim also fails.  To succeed on such a claim, Harvey must show a persistent and widespread policy or practice that results in the violation of prisoners' rights, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference.  *Owens v. Baltimore City State Attorneys Office*, 767 F.3d 379, 402–03 (4th Cir. 2014).  The record here is devoid of any evidence of repeated constitutional violations resulting from the policies Harvey challenges.

**F.  Claim Nine: Claim against defendant LaCour for refusal to give clean bed sheets**

In addition to contending that the claim against LaCour is barred because Harvey failed to exhaust it, defendants also argue that, because Harvey failed to inform LaCour (or anyone) that the lack of a white bed sheet was causing him a skin rash or infection, his claim fails on its merits.  The court agrees and grants summary judgment on this claim.

The Eighth Amendment protects prisoners from cruel and unusual living conditions. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  "[T]he Constitution does not mandate comfortable prisons," however, and conditions that are "restrictive and even harsh . . . are part of the penalty that criminal offenders pay for their offenses against society."  *Id.* at 347–49.  It is well established that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).  To sustain an unconstitutional conditions claim, a prisoner must show that: (1) objectively, the deprivation was sufficiently serious, in that the challenged, official acts caused denial of "the minimal civilized measure of life*'s* necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  The prisoner must show "significant physical or emotional harm, or a grave risk of such harm," resulting from the challenged conditions.  *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

Here, Harvey has presented evidence that LaCour was told Harvey did not have a clean sheet for several weeks, but nowhere did he advise LaCour that he had developed a skin condition or present evidence that LaCour knew about any rash.  Absent any such knowledge, he cannot show that LaCour was deliberately indifferent to his health or safety.  Moreover, the deprivation of a sheet for a limited period of time is not the type of condition that deprives the inmate of "the minimal civilized measure of life's necessities," as required to establish the first element of an Eighth Amendment claim.  *Farmer*, 511 U.S. at 834; *Taylor v. Ely*, No. 7:19-cv-00099, 2020 WL

5834259, at *3 (W.D. Va. Sept. 30, 2020) ("Many courts . . . have held that temporary deprivations of clean clothing or bedding did not violate the Eighth Amendment."); *see also* Dkt. No. 313, reported at *Harvey v. Landauer*, No. 7:18-cv-00097, 2020 WL 3799197, at *4 (W.D. Va. July 7, 2020) (collecting authority for the proposition that being denied a shower or being in dirty clothing for brief periods of time, including periods of ten days, twelve days, and two weeks, did not violate the Eighth Amendment); *Beverati v. Smith*, 120 F.3d 500, 504 & n.5 (4th Cir. 1997) (stating in dicta that no Eighth Amendment violation occurred where inmates did not receive clean clothing, linen, or bedding as often as required by prison regulations, and that lasted for a period of six months).  Thus, LaCour is entitled to summary judgment.

**G.  Claim Eleven: Claim that defendant Herrick refused to approve Harvey's nose surgery**

Just as LaCour argued both that Harvey failed to exhaust and that she is entitled to summary judgment on the merits regardless, defendant Herrick also argues that, in addition to Harvey's failure to exhaust, the claim against him fails on its merits.  In particular, Herrick argues that he, like the defendants in Claim Three and Four, had no ability to override the medical provider's decisions as to the appropriate or necessary treatment for Harvey.[18]  As with the other defendants and for the same reasons discussed as to them, Herrick, too, is entitled to summary judgment on this ground.  Indeed, this court and others have dismissed Herrick under similar circumstances.  *E.g.*, *Chavez v. Bailey*, No. 7:19CV00014, 2020 WL 2751899, at *6–*7 (W.D. Va. May 27, 2020) (granting summary judgment in Herrick's favor where his participation was limited to denying grievance appeals of prisoners complaining about delays in, and denials of, medical treatment); *Mize v. Herrick*, No. 1:10CV1124 GBL/TRJ, 2012 WL 683448, at *8 (E.D. Va. Mar. 2, 2012)

---

[18]  Harvey also challenges Dr. Herrick's contentions that he is not a medical provider and that his review of medical grievances is solely an administrative function, *i.e.*, to make sure prison medical providers are complying with VDOC procedures.  As the assigned magistrate judge previously discussed in an August 9, 2021 order denying Harvey's motion to compel and for sanctions, the fact that Dr. Herrick has a PhD and is referred to as "Dr." does not make him a medical doctor.  (Dkt. No. 384 at 1-2.)

(same); *see also Dobson v. Kiser*, No. 7:19CV00755, 2021 WL 1227925, at *4 (W.D. Va. Mar. 31, 2021) (granting Herrick's motion to dismiss where his involvement was upholding an institutional grievance on appeal that alleged deficient medical care); *Metcalf v. GEO Group, Inc.*, No. 3:19CV842-HEH, 2021 WL 2385103, at *8 (E.D. Va. June 10, 2021) (same).

## IV.  CONCLUSION

For all of the reasons discussed above, defendants' motion for summary judgment will be granted in large part, and denied only as to the Eighth Amendment claim against defendant Russell, alleging that he failed to protect Harvey from the July 21, 2017 attack by Poe.  That claim will be set for a three-day jury trial in Harrisonburg.  An appropriate order will be entered.

Entered: August 27, 2021.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge